**CONTINENTAL CASUALTY COMPANY, Plaintiff,**

v.

**Hulbert T. E. BEARDSLEY and H. T. E. Beardsley, Inc., Defendants.**

United States District Court
S. D. New York.
April 4, 1957.

**30**

Watson, Leavenworth, Kelton & Taggart, New York City, for plaintiff. Leslie D. Taggart and Robert C. Nicander, New York City, John Rex Allen, Paul L. Latham, Chicago, Ill., of counsel.

Sprague & Peck, New York City, for defendants. Stuart Sprague and Robert P. Weil, New York City, of counsel.

PALMIERI, District Judge.

Continental Casualty Company (Continental), an Illinois corporation, seeks a declaratory judgment [1] that the defendants' copyright is invalid and not infringed, damages for unfair competition and for violation of the antitrust laws because of alleged misuse of the claimed copyright, and injunctive relief. The defendants seek damages on the ground of copyright infringement, unfair competition, and the inducement of breaches of implied contracts and confidential disclosures, and injunctive relief. The case was tried without a jury.

Essentially, the litigation stems from the defendant H. T. E. Beardsley's (Beardsley)[2] claim that he is the originator of a plan called the "Beardsley Plan" and that the elements of this plan were validly copyrighted when he published a book entitled: "The Replacement of Lost Securities by the Beardsley Plan," on September 30, 1939, with notice of copyright.[3] This book, better described as a pamphlet, consists of six pages, less than three of them explanatory matter, and the rest taken up by three insurance forms designed to provide blanket indemnity protection.

1. Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2202 (1952).

2. H. T. E. Beardsley, Inc. was named as a co-defendant. Its legal position does not differ from that of Hulbert T. E. Beardsley. The use of "defendant" or "Beardsley" is intended to refer to both.

3. See Exhibit No. 3.

The problem of replacing lost stock certificates was one which vexed corporations having large numbers of stockholders. Because the stockholder as well as the corporation often had to do tedious and protracted paper work, in the event of stock certificate losses, the use of the blanket indemnity bond offered a convenient solution. Beardsley's plan was, in essence, an adaptation of the blanket indemnity bond device to the exigencies of the situations requiring the replacement of corporate securities which became lost or were stolen. Whether or not defendant was the sole originator of his plan is disputed. It is, however, clear that he popularized blanket protection in this field and in the related fields of losses of stock sent through the mail and of transfer of stock in waiver of probate proceedings.

The narrative part of the publication referred to was largely an exposition of the reasons of convenience and economy which should impel the use of the attached indemnity insurance forms both by corporations and their stockholders. On the first page of the narrative explanation and over the name of H. T. E. Beardsley appears the following:

> "The Beardsley Plan originated and developed by me, though appearing simple, required months of labor to perfect. There is no charge for the plan but if adopted I would naturally expect to be permitted to arrange the bond."

It was conceded that the publication was distributed gratis, that many large corporations adopted the use of the forms, or substantially similar forms, and that Beardsley derived a considerable income from the commissions paid to him by the surety companies designated by these corporations as indemnitors.

Continental, which has its principal place of business in Chicago, does an extensive surety business. As part of that business, it has provided for the issuance of "Blanket Loss Original Instrument Bonds" which serve substantially the same purpose as the ones promoted by Beardsley in his business as broker. It has also underwritten coverage for losses of stock sent through the mails, and for transfers of stock in waiver of probate proceedings.

The business interests of the plaintiff and Beardsley have been in conflict for a number of years, and at least since 1948. In that year, in a letter to Continental, Beardsley charged Continental with infringement of his forms, and suggested that he could add plaintiff "to my list" and that he would "cooperate with them in getting for them a share of the business." [4] Presumably, this was to be in exchange for his being recompensed by Continental as broker on all such coverage handled by Continental.[5] Beardsley also stated, in the same letter, that he claimed no copyright "on a Bond" and that he had not sued and had no intention of suing anyone for infringement; but he also stated he had assurances from his attorneys that he had a good copyright on "my forms."

There can be no question that the defendants' business has been built up upon the representations that the "Beardsley Plan" was Beardsley's own, validly copyrighted, and consequently, the proper subject for its exclusive exploitation by him. Except for the narrative portion of the publication, plaintiff urges that Beardsley had nothing to copyright and that his assertions of exclusive rights of exploitation to the "Beardsley Plan" and to the documents implementing the plan have no legal basis. At the very threshold of the case, therefore, I must consider whether the defendants have a valid copyright.

## I—Copyrightability

■ The general purposes of copyright protection are to afford authors the

---

4. See Exhibit No. 18.

5. Although the letter is silent with respect to defendant's expected consideration, his desires are made clear by his dealings with other companies, from his testimony at the trial and from statements in his post-trial brief.

right to reap the fruits of their expression and to promote the store of information and objects of culture available for public enjoyment and application.[6] Usually these two purposes are not inconsistent. Where, however, an author's monopoly threatens to infringe unduly on public use of the ideas or objects of that expression,[7] the courts have demonstrated flexibility in adjusting the conflicting theories.[8] Thus copyrightability may be altogether denied,[9] or, if copyright is upheld, restrictively protected by requiring almost verbatim copying to constitute infringement.[10] In other situations, the subject and purpose of copyright may be explicitly defined so as not to authorize an over-generalized monopoly which would restrict fair use of the disclosed information or objects.[11]

6. See U.S.Const. Art. I, Sec. 8; Yankwich, Originality in the Law of Intellectual Property, 1951, 11 F.R.D. 457, 460; Chafee, Reflections on the Law of Copyright: I, 45 Col.L.Rev. 503, 506–513 (1945); Note, Study of the Term "Writings" in the Copyright Clause of the Constitution, 31 N.Y.U.L.Rev. 1263, 1290 (1957); Note, Constitutional Limits on Copyright Protection, 68 Harv.L. Rev. 517 (1955).

7. "[A] copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea—not the idea itself." Mazer v. Stein, 1954, 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (dictum). See also Baker v. Selden, 1880, 101 U.S. 99, 105, 25 L.Ed. 841; cf. Oxford Book Co. v. College Entrance Book Co., 2 Cir., 1938, 98 F.2d 688.

8. "The same result also follows from the fact that a copyright never extends to the 'idea' of the 'work,' but only to its 'expression,' and that no one infringes, unless he descends so far into what is concrete as to invade that 'expression.' We can add nothing to what we said in Nichols v. Universal Pictures Corp., 2 Cir., 45 F.2d 119 and Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 81 F.2d 49, * * *." National Comics Pub., Inc., v. Fawcett Pub., Inc., 2 Cir., 1951, 191 F.2d 594, 600; see also W. H. Anderson Co. v. Baldwin Law Pub. Co., 6 Cir., 1928, 27 F.2d 82.

9. See Baker v. Selden, supra, note 7; Taylor Instrument Co. v. Fawley-Brost Co., 7 Cir., 139 F.2d 98, certiorari denied 1943, 321 U.S. 785, 64 S.Ct. 782, 88 L.Ed. 1076; Amberg File & Index Co. v. Shea Smith & Co., 7 Cir., 1897, 82 F. 314; Kanover v. Marks, D.C.S.D. N.Y.1951, 91 U.S.P.Q. 370; Muller v. Triborough Bridge Authority, D.C.S.D. N.Y.1942, 43 F.Supp. 298 (alternative holding); Aldrich v. Remington Rand, Inc., D.C.N.D.Tex.1941, 52 F.Supp. 732; Long v. Jordan, D.C.N.D.Cal.1939, 29 F. Supp. 287 (alternative holding); Fulmer v. United States, 1952, 103 F.Supp. 1021, 122 Ct.Cl. 195; cf. Downes v. Culbertson, 1934, 153 Misc. 14, 275 N.Y.S. 233 (no literary property in an idea).

But cf. Deutsch v. Arnold, 2 Cir., 1938, 98 F.2d 686 (infringement by a former employee); Smith v. Thompson, D.C. S.D.Cal.1941, 43 F.Supp. 848, 850 (same); Edwards & Deutsch Lithographing Co. v. Boorman, 7 Cir., 15 F. 2d 35, certiorari denied 1926, 273 U.S. 738, 47 S.Ct. 247, 71 L.Ed. 867 (infringement by one who had access because of a continued course of dealing).

10. See Miner v. Employers Mut. Liab. Ins. Co., 1956, 97 U.S.App.D.C. 152, 229 F.2d 35; Crume v. Pacific Mut. Life Ins. Co., 7 Cir., 140 F.2d 182, certiorari denied 1944, 322 U.S. 755, 64 S.Ct. 1265, 88 L.Ed. 1584; Dorsey v. Old Surety Life Ins. Co., 10 Cir., 1938, 98 F.2d 872; Oxford Book Co. v. College Entrance Book Co., note 7, supra; Guthrie v. Curlett, 2 Cir., 1929, 36 F.2d 694; Long v. Jordan, note 9, supra; Hartfield v. Peterson, 2 Cir., 1937, 91 F.2d 998, 999 (dictum). But cf. Nutt v. National Inst., Inc., for the Improvement of Memory, 2 Cir., 1929, 31 F.2d 236 (infringer appropriated to explain a system of memory improvement, not to employ that system in his teaching).

11. See Baker v. Selden, note 7 supra, 101 U.S. at pages 104–105; Brief Eng. Systems, Inc., v. Owen, 2 Cir., 48 F.2d 555, certiorari denied 1931, 283 U.S. 858, 51 S.Ct. 650, 75 L.Ed. 1464; W. H. Anderson Co. v. Baldwin Law Pub. Co., 6 Cir., 1928, 27 F.2d 82; Brightley v. Littleton, C.C.E.D.Pa.1888, 37 F. 103; Edward Thompson Co. v. American Law Book Co., 2 Cir., 1903, 122 F. 922, 61 L.R.A. 607; Chautauqua School of Nursing v. National School of Nursing, 2 Cir., 1916, 238 F. 151; Griggs v. Perrin, C.C.N.D.N.Y.1892, 49 F. 15; Stone & McCarrick, Inc., v. Dugan Piano Co., D.C.E.D.La.1914, 210 F. 399; cf. American Inst. of Architects v. Fenichel, D. C.S.D.N.Y.1941, 41 F.Supp. 146 (finding

The overreaching of a legitimate monopoly of expression has often arisen in connection with legal forms.[12] The classic situation is the creation, by dint of labor and inventiveness, and publication of a novel arrangement which greatly simplifies the problems incident to a particular legal task. Copyright protection is, of course, afforded the author as against copying disseminators of this information.[13] The monopoly the author really covets, however,—the right to exact royalties from all who use the forms—is generally denied to him.[14] Thus, in Baker v. Selden,[15] the Supreme Court denied protection as against one who appeared to have copied an arrangement of columns for handling accounts. And in Dorsey v. Old Surety Life Ins. Co.,[16] protection was denied as against a user of insurance forms probably very similar to those of the copyright owner, the decision being based on alternative holdings of non-infringement and lack of copyrightability.

There is sound policy to support this position. Where infringement is accomplished by one who seeks to disseminate information, the situation is not different from those where expressions of novelists, poets, and artists are given liberal protection. However, where the putative infringement is accomplished by one who uses the legal form for the function for which it was designed, different considerations become important.[17]

Skill in drafting legal instruments necessitates familiarity with the applicable forms and with the apposite jurisprudence. It follows that time tested terminology lends itself to repetitive use, given similar needs for its employment. The essence of good drafting is to free the client as much as possible from the danger of litigation, and the chances of controversy are generally attenuated when words with a history of settled meaning or of accepted usage are found and utilized. While this practice in other fields might be termed plagiarism, among lawyers its propriety is unquestioned.

One might urge that the propriety should be recognized if the putative infringer demonstrates that he has labored independently of the purportedly copyrighted document, as, for example, testing the original language and modifying, rejecting or retaining it as the in-

---

of fair use enhanced by an implied invitation to public freely to use forms included in copyrighted booklet.)

12. See Crume v. Pacific Mut. Life Ins. Co., note 10, supra; Dorsey v. Old Surety Life Ins. Co., note 10, supra; American Inst. of Architects v. Fenichel, note 11, supra; Brightley v. Littleton, note 11, supra; cf. Long v. Jordan, note 9, supra (legislative program); W. H. Anderson Co. v. Baldwin Law Pub. Co., note 11, supra (law digests); West Pub. Co. v. Edward Thompson Co., C.C.E.D.N.Y.1911, 184 F. 749 (same); Edward Thompson Co. v. American Law Book Co., note 11, supra (same).

13. Hartfield v. Peterson, 2 Cir., 1937, 91 F.2d 998; Guthrie v. Curlett, note 10, supra; Nutt v. National Inst., Inc., for the Improvement of Memory, note 10, supra; W. H. Anderson Co. v. Baldwin Law Pub. Co., note 11, supra; Edwards & Deutsch Lithographing Co. v. Boorman, note 9, supra; Jeweler's Circular Pub. Co. v. Keystone Pub. Co., 2 Cir., 281 F. 83, 26 A.L.R. 571, certiorari denied 1922, 259 U.S. 581, 42 S.Ct. 464, 66 L.Ed. 1074; Reiss v. National Quotation Bureau, C.C.S.D.N.Y.1921, 276 F. 717; Nikanov v. Simon & Schuster, Inc., D.C.S.D.N.Y.1956, 144 F.Supp. 375; Brightley v. Littleton, note 11, supra. See also Alexander v. Mackenzie, [1846–47] 9 Ses.Cas. 748 (1847); Real Estate Inst. of N. S. W. v. Wood, 23 St. Rep. 349 (N.So.Wales, 1923). Contra, Baker v. Selden, note 7, supra.

14. See cases cited in notes 9–11, supra.

15. 1880, 101 U.S. 99, 25 L.Ed. 841.

16. Note 10, supra; see also Crume v. Pacific Mut. Life Ins. Co., note 10, supra; see cases cited in note 10.

17. In Deutsch v. Arnold, Smith v. Thompson and Edwards & Deutsch Lithographing Co. v. Boorman, all cited in note 9, supra, infringement was found against one who seemed to have appropriated the idea in the asserted copyright for a functional use. However, these three cases are distinguishable by the fact that appropriation had been made possible by a relationship of employment or continued business dealings. See also Van Oppen & Co. v. Van Oppen, 20 Rep.Pat.Cas. 617 (Ch.1903).

dependent researches suggest. However, the argument would run, if there appears to be merely a copying from the original—an unmistakable profiting solely from the labors of another—the copyright should be given effect. Although this position appears at first blush to be a just one, its adoption would create a mischievous precedent. A legal draftsman should not feel encumbered by copyright dangers vindicable only by court proofs of independent efforts, for such ·vindication in litigation is the exact evil his labors seek to avert. His skill should not lie in threading through jargon in a maze of forms, each one copyrightable because of a unique manner of expression even though all are on the same subject matter. Furthermore, the originator of a legal writing should have little to fear from one whose talents compel him to copy verbatim. The skill of a lawyer is commensurate with his ability to adapt present exigencies to foreseeable legal consequences. Such skill cannot be copied and the originator has nothing to fear from the slavish imitator.

In the instant case, Beardsley has copyrighted and published, I will assume for this argument, a booklet of explanation with forms entitled the "Beardsley Plan." There is no question that the booklet is copyrightable, and Continental so admits. There is also no question that Beardsley's arrangement of contents in his proposed bond, however novel that arrangement may be, is not copyrightable, for the novelty of the arrangement is the key concept in the plan, and ideas and plans fall outside the copyright laws.[18] While Beardsley's statements and actions before and during trial suggest a claim of copyright that would include the arrangement, his brief is clear that he makes no claim to a copyright on the plan.[19] Thus, the

18. The novelty, if there was such, of the Beardsley method is the drastic reduction of the numerous papers formerly required. This, and the substance of the language making it possible, is the subject of Beardsley's explanation. As an idea or an invention, the subject is not copyrightable. See notes 7 and 8 supra.

19. Before and throughout the trial, Beardsley and his attorneys referred to the "plan" and not the individual writings as the subject of the copyright. Putative infringers were accused of infringing the "plan," and Beardsley wrote that he "claimed no copyright on a bond." See note 9, supra. Beardsley seemed to be unconcerned with his use of any particular phraseology and mentioned that phrases were often changed to accede to the wishes of attorneys or clients. He referred to these changes as "legal spinach." In one instance, a company threatened with infringement was offered the following settlement by Beardsley's attorney:

"I (the company official) told him (Beardsley's attorney) National Union (the affected company) preferred its own forms and Sprague immediately countered with the statement that it might use any language it sees fit, so long as the words 'Copyright 1939, H. T. E. Beardsley' appear at the bottom of the application or, as he calls it, the affidavit of loss and indemnity agreement. He kept insisting on the legend in order to protect, as he said, Beardsley's copyright.

"I expressed surprise that he was not interested in the form of the blanket bond but he replied pointedly that he was concerned only about the affidavit of loss and indemnity agreement. He said that Beardsley does not even provide a form of resolution for the use of corporations in approving use of the system." See Exhibit No. 60.

And, in another instance, Beardsley wrote as follows:

"To relinquish our copyright or spread the information generally would mean that we would have no reward for our idea except the privilege of costly litigation. I don't want to be a dog in the manger and won't be but your knowledge of this very simple plan came to you from me. For forty years or more no surety man took the trouble to sit down and develop this idea. I believe you will see the fairness of not using my idea and I have perfect confidence in your integrity. If I hadn't had I should not have disclosed the matter to you. Please understand that in giving you permission to use the Beardsley Plan in certain cases is not done with any thought that it will influence your decision.

" * * * To protect myself I have managed so far to get the companies to refer to my plan as the Beardsley Plan —not the Beardsley Bond." See Exhibit C U.

issue is drawn as to whether or not Beardsley's bond is protectible against infringement of its language, assuming arguendo that there was copying.

 Continental, as a surety company, writes many forms of insurance in the normal course of its business, sometimes at the request of a purchaser, other times on its own initiative. Beardsley contends that Continental wrote its bonds in the latter fashion, and that its making the bonds available and selling them to customers constitute an infringement. But, in whatever fashion the bonds were written and sold, and the matter is disputed, it is clear that Continental, if it was using the information and language which Beardsley devised, was using it in the regular course of its business of selling and providing insurance. For the reasons expressed above, I hold that Beardsley is not entitled to copyright protection as against Continental's infringement, even assuming such infringement to exist.

## II—Infringement

Beardsley's scheme, in general, provided for a surety binding itself to indemnify the corporation or transfer agent for liability which might result from improper replacement of lost securities. When a stockholder would petition for the replacement of his lost shares, he would be sent a form of affidavit, which called for a request for replacement, a statement of his financial responsibility, and his promise to indemnify the surety, corporation and transfer agent. The surety, upon receiving this affidavit, would execute and deliver a certificate by which it assumed liability on the bond previously filed with the corporation or transfer agent, and the latter would then replace the stock.

Defendant's claims of copyright revolve around four points which he claims were original in his writings. His plan does not require the surety company to fix its liability by a specific sum on the bond filed by the surety with the corporation or transfer agent subscribing to the plan; instead the company can leave its penalty open limited only by a maximum sum established by statute for any specific claim. Another feature obviates the necessity of having a specific shareholder as principal of this bond; the surety assumes liability directly, fortified by the shareholder's promise of indemnification. A third feature makes the bond prospective in its coverage; the losses of stock to which it applies have not yet occurred when the bond is executed. The fourth feature is a clause in the bond which makes the surety's liability contingent upon its filing with the corporation or transfer agent a certificate by which it assumes its obligation. Except for unimportant variations, the other papers which defendant claims to have been infringed all bear similar notions and are similarly expressed.

Defendant has sought to prove his claim of infringement by proving that the draftsman for the plaintiff had access to the Beardsley papers, which the plaintiff acknowledged, and that Continental's forms are strikingly similar to Beardsley's and to forms which allegedly infringed them.[20]

The defendant urges this by allusion to two solecisms in the Continental pa-

---

During the trial, counsel for the plaintiff asked Beardsley if he claimed a copyright on his form of bond. Beardsley replied:

"That's right, no copyright. It should have said, 'No copyright on a blanket bond,' but I wasn't making a blanket copyright on a bond. There are millions of bonds. That's what I meant. But this I was making a copyright on a plan that included a bond, which of course was copyrighted with the plan." See Record, p. 573.

Nevertheless, in the brief and in formal statements when challenged, Beardsley's attorneys denied a claim of copyright on the "plan," asserting it only on the writings.

20. Beardsley's position was in large measure based upon an attack on the credibility of Continental's draftsman, an attorney, who was a witness at the trial. I believe his testimony was credible and I do not subscribe to the arguments to the contrary.

pers: (1) a common grammatical error in verb tense identically made in a Continental form and in that of an alleged infringer; and (2) an inconsistency in that the term "principal" was not changed in all instances to "owners and obligors," the terms describing those who were liable on the blanket bonds. Defendant suggests that the latter point demonstrates a "scissors-and-paste" job on the part of the Continental draftsman, an argument from which I presumably am to infer that the draftsman copied from the Beardsley paper those parts in which the persons who are liable are correctly described.

■ I believe that defendant's proof of infringement is insufficient, despite the apparent similarity of expression found in the forms of the two parties. This is especially so with respect to defendant's claim of indirect infringement, that is, copying from the forms of an infringer, for there is no proof that the purported first infringer did in fact infringe. Defendant seeks to support his argument that the putative first infringer alluded to above in the discussion of plaintiff's solecisms, settled a prior lawsuit brought by Mr. Beardsley. But, of course, a settlement cannot be proof of an acquiescence in the merits of Beardsley's claims.[20a]

The striking similarity of language is totally explicable by the nature of the insurance art. Both Mr. Beardsley's format and his expressions were and are common in the business. For instance, practically all of his bond was anticipated by a blanket lost instrument bond to cover real estate transactions written in 1936 by the London and Lancashire Indemnity Company of America.[21] It was also anticipated for the most part by a bond written in 1937 by the Fidelity and Casualty Company[22] and by forms appearing in Christy, The Transfer of Stock, at page 902[23]. Both of the latter sources were employed by the plaintiff's draftsman. He also referred to a waiver of probate bond of the National Surety Corporation,[24] allegedly written by Mr. Beardsley but not containing any notice of copyright and a blanket lost securities bond written in 1945 by the Great American Indemnity Co.[25]

The affidavit of loss similarly contains much identical language, which again is totally explicable by the nature of the art. Thus, defendant can claim no novelty of expression (novelty of idea is irrelevant) with respect to the information of financial worth sought to be elicited. Furthermore, there are differences in phraseology which can be seen by comparing the following paragraphs in the two forms.[26]

Defendant's form:

"(8) Deponent agrees in consideration of the foregoing to indemnify and protect said .......... (Name Corporation, Banks, Surety Company) their Co-Transfer Agents, Co-Registrars, Co-Trustees and Co-Paying Agents, individually and as Trustee, Depositary, Fiscal or Paying Agent, Registrar, Transfer Agent and in any other capacity, their respective legal representatives, successors and assigns, and also any successors in

---

20a. The settlement, effected in November 1952, was between the Pullman Company and Beardsley. Beardsley, in using that settlement as a threat of sanction against other alleged infringers, wrote: "* * * the standing of the Attorneys for the Pullman Company was of greater value to validate my copyright than the opinion of some unknown judge in the District Court." See Exhibit No. 39. One might wonder what the Pullman Company had to lose by substituting Beardsley for any other broker.

Continental, on the other hand, has a far more substantial interest in the outcome of the instant litigation.

21. See Exhibit No. 43.

22. See Exhibit No. 53.

23. See Exhibit No. 64.

24. See Exhibit A W.

25. See Exhibit F Q.

26. See Exhibit No. 20.

any such capacities, from any and all loss, damage or expense in connection with, or arising out of their compliance with the request of deponent herein set forth, and further agrees to furnish to the above-named obligees, without any expense to them, a new bond of indemnity, in such form and amount as said obligees may require, with satisfactory surety or sureties, in case the above-described Lost Security Blanket Bond and this Agreement of Indemnity should not at any time for any reason in the opinion of said obligees or any of them afford sufficient protection."

Plaintiff's form:

"Affiant, for himself, his heirs, assigns and personal representatives, hereby agrees, in consideration of the issue of such new or replacement certificate or certificates, or the distribution to affiant of the liquidation proceeds thereof, and in consideration of the assumption by said Surety Company of liability therefor under its Blanket Bond, that affiant, his heirs, assigns, and personal representatives, will indemnify, protect and save harmless the following named Obligees, their successors and assigns, from any and all loss or damage or expense in connection therewith. The Obligees referred to in this paragraph are (a) said Surety Company, (b) said Company, (c) its Transfer Agent, and (d) its Registrar, and (e) any additional or successor Transfer

Agents or Registrars of said Company hereafter appointed. Affiant agrees that this affidavit and agreement may be attached to and made part of said Blanket Bond; and affiant hereby further agrees to furnish the Obligees (without expense to Obligees) with a new bond of indemnity with satisfactory surety or sureties in case said Blanket Bond and this Indemnity Agreement should not at any time, for any reason in the opinion of the Obligees, afford sufficient protection."

In comparing these paragraphs, one must remember that words of insurance art, and not literary expressions, are involved. Therefore, what might be called a paraphrase and plagiarism in another matter, is significantly different for the purposes of the matter at hand.[27] All the words and expressions are commonplace within the insurance field. Any different interpretation would serve to confer a monopoly of an idea.

Defendant's proof was intended to suggest the inference of copying from arguments directed at demonstrating striking similarity between its forms and those of the plaintiff. Where there were differences in wording between them, defendant then sought to explain plaintiff's language by tracing it to another source. This tour de force cannot be successful, and can only serve to hoist defendant by his own petard, since if his forms were to be subjected to the same treatment, they too would appear to infringe.[28] And this for a simple

---

**27.** Compare Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 81 F.2d 49, certiorari denied 1936, 298 U.S. 669, 56 S. Ct. 835, 80 L.Ed. 1392 (infringement of a stage play), with Oxford Book Co. v. College Entrance Book Co., 2 Cir., 1938, 98 F.2d 688 (no infringement of a high school history text).

**28.** It is interesting in this connection to consider an admission made by Beardsley that he was not the sole originator of his plan. Thus he wrote:
"I recognize that the Beardsley Plan in connection with which Blanket Lost Security Bonds are written was formulated in cooperation with the Indemnity Insurance Company of North America and in consideration of the assistance rendered to me by you in the development of the idea and the securing of the two accounts already written by you, the Columbia Gas & Electric Company and the General Electric Company, I agree to release the Beardsley plan and copyrighted bond form in use by your Company in the development of business through your own agents and brokers."
See Exhibit No. 41.

reason—any novelty of arrangement Mr. Beardsley devised, and it is unnecessary for me to rule on this disputed point—was produced by applying familiar, boiler plate language of the insurance art. Since the arrangement is the key idea of the Beardsley plan, and an idea cannot be copyrighted, and since Beardsley did not use a unique form of expression, defendant's claim of infringement must fail even assuming insurance forms such as these are copyrightable.

## III—Publication

■ A finding of copyrightability, if one were made, does not by itself entitle an author to copyright protection. Authors enjoy such protection before their writings are published, and, if the provisions of the copyright statute are followed, after publication.[29] If, however, copies are distributed without the statutory requirements being satisfied, and if the distribution is not limited to a restricted group and for a particular purpose, the author loses his protection and cannot prevent copying of material so distributed.[30]

In the instant case, Beardsley devised his plan for the replacement of lost securities over a period of a year and a half ending in late 1938 or early 1939, and demonstrated both his inchoate and completed work to lawyers and businessmen in the surety and corporation fields, besides taking advice and accepting revisions throughout that time from them. In January of 1939, Beardsley had 100 copies of his pamphlet printed and distributed these copies to potential customers—corporate officers, transfer agents and surety companies. Also in that month, Columbia Gas & Electric Corporation (and apparently also Loft and General Electric companies) began to use Beardsley's system. It mimeographed copies of his form of bond and filed

one executed by the Indemnity Insurance Company of North America as surety. It also printed forms of affidavit which it sent out, allegedly with instructions to return them whether or not used, to nine or ten stockholders who had lost their securities. Until this time, none of Beardsley's papers contained any notice of copyright.

In September of 1939, Beardsley had printed 500 more copies of his pamphlet. The copies bore on them a notice in the form "© 1939 H.T.E.Beardsley," and were distributed beginning October 2, 1939 to potential customers and to three persons who had no apparent economic interest in the plan. On June 23, 1945, copyright of the pamphlet was registered in the Copyright Office, the date of publication being given as September 30, 1939.

After October 1939, not only the booklet but all the forms of affidavit contained this notice. The only exceptions were the affidavits sent out to shareholders between 1941 or 1942 and 1949, by the Niagara Mohawk Power Company, a user of Beardsley's plan, and the notice was finally put on them when Beardsley brought the matter to the attention of the Corporation. In general, none of Beardsley's bonds was marked with the notice, and at one point after publication and notice of copyright, he stated that he claimed no copyright on a bond.[31] In December, 1948, Beardsley, on the advice of counsel, had the form of notice on his papers changed so that "copyright" replaced "©."

Beardsley contends that the distribution of the first edition of his pamphlet was a limited one and hence was not a forfeiture of his common-law copyright. Thus, he argues, his later publication with notice of copyright was sufficient to place him within the coverage of the

---

This admission is not rationalized by subsequent comments by which he insisted that he had a copyright.

29. See Nimmer, Copyright Publication, 56 Col.L.Rev. 185 (1956).

30. Id., at pages 200–201; See National Comics Pub., Inc., v. Fawcett Pub., Inc., 2 Cir., 1951, 191 F.2d 594; American Visuals Corp. v. Holland, 2 Cir., 1956, 239 F.2d 740, 744.

31. See note 4, supra.

federal statute, which coverage was made complete upon subsequent registration in 1945. The form of bond, he says, was never publicly distributed, and hence needed no notice of copyright for common-law copyright was never forfeited. The "©," his argument continues, although not sanctioned by the copyright laws, was a harmless error of form which could not have misled putative infringers. So also was the careless omission of the copyright notice from the papers of the Niagara Mohawk Power Company.

I take up first the question of forfeiture, and since I decide it adversely to Beardsley's position, it will not be necessary to pursue the other points. It is true that the first edition was distributed to a limited group, but interest in his plan would naturally be confined to this group. This is evidenced by the fact that the subsequent printings with notice of copyright were similarly disseminated, except for the three copies distributed, as a matter of form, to the disinterested people. Beardsley contends that this pamphlet was circulated upon the condition that it could not be shown to others and had to be returned if not adopted. However, this statement was not proved and I cannot conclude that the actual conditions of distribution were those described. Beardsley testified that he had no thought of copyright at the time,[32] and his entire selling technique encouraged those in the banking, corporation and surety community to discuss and exhibit his forms among themselves.[32a] Moreover, it is clear that anyone interested in the plan could have readily obtained one of Beardsley's pamphlets. Thus, I conclude that as a matter of fact the distribution of the first edition was unrestricted.[33]

Since the vitality of federal copyright protection is in question, it might be expected that federal law would be applied to determine whether that protection was vitiated by an earlier forfeiture.[34] However, that forfeiture, if there were such, was of a common-law copyright, that is, of an author's literary property. Since this common-law right preceded the Constitutional grant[35] and was preserved, not established, by the copyright statutes,[36] it would follow that state law should determine its scope. The issue is far from clear and there are decisions[37] and compelling arguments[38] both

32. Cf. Exhibit #41.

32a. See Exhibit #62.

33. The form of bond, since it was included in the pamphlet, is governed by the same principles which determine whether or not Beardsley abandoned his common-law copyright. Moreover, it is doubtful that the bond was never publicly distributed. When a corporation or transfer agent subscribed to Beardsley's plan, it was customary for it to file a bond executed by the surety company. However, there is no evidence that there were any restrictions against copying the bond. The transfer agent might have done this for the purpose of persuading other companies which it represented to subscribe to the plan, or the bond might have been copied for the purpose of discussing Beardsley's plan with other firms.

34. See Capitol Records, Inc., v. Mercury Records Corp., 2 Cir., 1955, 221 F.2d 657, 664 (dissenting opinion, L. Hand, J.); cf. Fashion Originators Guild of America, Inc., v. F. T. C., 2 Cir., 1940, 114 F.2d 80, affirmed 1941, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (by implication); Brown v. Select Theatres Corp., D.C.D.Mass.1944, 56 F.Supp. 438 (by implication); Werckmeister v. American Lithographic Co., 2 Cir., 1904, 134 F. 321, 324, 68 L.R.A. 591.

35. U.S.Const. Art. I, Sec. 8. See Note, Copyright—Study of the Term "Writings" in the Copyright Clause of the Constitution, 31 N.Y.U.L.Rev. 1263, 1264–1268 (1956).

36. See 61 Stat. 652 (1947), 17 U.S.C. § 2 (1952); Atlantic Monthly Co. v. Post Pub. Co., D.C.D.Mass.1928, 27 F.2d 556, 558; Capitol Records, Inc., v. Mercury Records Corp., note 34, supra, 221 F.2d at pages 666–667 (dissenting opinion).

37. Compare Capitol Records, Inc., v. Mercury Records Corp., note 34, supra, with G. Ricordi & Co. v. Haendler, 2 Cir., 1952, 194 F.2d 914; Fashion Origina-

38. See note 38 on page 40.

ways. Since the matter was not briefed or argued, I think it wiser to leave the question to the side, since I can decide the matter before me by referring to both federal and New York law.[39]

Federal law, while clear in its statement that the common-law protection is lost by a distribution not limited to a restricted group and for a particular purpose, is not entirely clear in its application. The difficulty arises from comparing generally similar factual situations which are deemed to constitute general publications where satisfaction of federal copyright requirements is an issue, but limited publications when forfeiture of common-law copyright is in-volved.[40] Recently, the Second Circuit has formalized this tendency toward a double standard by stating it, albeit by way of dictum, as a rule of law.[41]

■ It is doubtful that this feature of copyright law was intended to apply to situations similar to that of defendant. The concept of limited publication, it would seem, serves the purpose of permitting authors to submit copies of their writings to associates and acquaintances for criticism without losing their literary property.[42] It also allows authors to give copies to a few of their friends,[43] to submit copies to a very restricted number of potential customers,[44]

tors Guild of America, Inc., v. F. T. C., note 34, supra (by implication); RCA Mfg. Co. v. Whiteman, 2 Cir., 114 F.2d 86, certiorari denied 1940, 311 U.S. 712, 61 S.Ct. 393, 85 L.Ed. 463 (by implication); American Visuals Corp. v. Holland, note 30, supra (by implication).

38. The argument for a state test is based on federalist principles—a right, if emanating from state law, should take on the coloration of and be defined by that law. See Association of Westinghouse Salaried Emp. v. Westinghouse Elec. Corp., 1955, 348 U.S. 437, 75 S.Ct. 488, 99 L.Ed. 1256; Austrian v. Williams, 2 Cir., 198 F.2d 697, certiorari denied 1952, 344 U.S. 909, 73 S.Ct. 328, 97 L.Ed. 701. However, the Constitutional clause suggests a policy of national uniformity. Furthermore, federal statutes establish certain procedures as a condition precedent to the grant of a statutory monopoly, and define the granted monopoly in terms of duration. If equal and lengthier protection could be had under state law, the federal scheme would be defeated. See Hart & Wechsler, the Federal Courts and the Federal System 691–700 (1953). Perhaps the issue might be compromised by allowing the states to legislate within a federally prescribed standard. Cf. Cooley v. Board of Wardens, 1851, 12 How. 299, 53 U.S. 299, 13 L.Ed. 996.

39. I look to New York law because most of Beardsley's contacts while drafting and selling his plan were in that state. Choice of law is another most difficult problem projected by a state test. Cf. Leverton v. Curtis Pub. Co., 3 Cir., 1951, 192 F.2d 974 and Ettore v. Philco Television Broadcasting Corp., 3 Cir.,

229 F.2d 481, certiorari denied 1956, 351 U.S. 926, 76 S.Ct. 783, 100 L.Ed. 1456, where federal courts in multiple-tort diversity cases had to unravel conflicts of laws issues entwined in the law of several states.

40. See comparisons cited in American Visuals Corp. v. Holland, note 30, supra.

41. American Visuals Corp. v. Holland, note 30, supra 239 F.2d at page 743. Judge Medina, concurring, noted that the statement was completely unnecessary to the decision and, moreover, was not "previously perceptible to the courts or to the copyright bar. See, e. g., Nimmer, Copyright Publication, 56 Colum.L. Rev. 185." Id., 239 F.2d at page 745.

42. See Dieckhaus v. Twentieth Century-Fox Film Corp., D.C.E.D.Mo.1944, 54 F.Supp. 425, reversed on other grounds, 8 Cir., 153 F.2d 893, certiorari denied 1946, 329 U.S. 716, 67 S.Ct. 46, 91 L. Ed. 621; Schlattman, The Doctrine of Limited Publication in the Law of Literary Property compared with the Doctrine of Experimental Use in the Law of Patents, 5 ASCAP Copyright Law Symposium 37, 38 (1954).

43. Prince Albert v. Strange, 2 DeG & Sm. 652, 64 Eng.Rep. 293 (Ch.1848); on appeal 1 Mac. & G. 25, 41 Eng.Rep. 1171 (Ch.1849), cited in Drone, Copyright 121 (1879); cf. Mills Music v. Cromwell Music, D.C.S.D.N.Y.1954, 126 F.Supp. 54 (distribution of stenciled copies of a song to military personnel).

44. Moore v. Ford Motor Co., 2 Cir., 1930, 43 F.2d 685; Press Pub. Co. v. Monroe, 2 Cir., 73 F. 196, 51 A.L.R. 353, writ of error dismissed 1896, 164 U.S. 105, 17 S.Ct. 40, 41 L.Ed. 367; Jerome v. Twen-

and to present copies of technical writings along with lectures.[45] In all these instances, it is generally presumed that those who receive copies in such circumstances are under an obligation to restrict their use to the terms of reference.[46] Accordingly, common-law copyright is not forfeited and the author remains eligible for federal copyright protection. The courts are generally unwilling, however, to deem as limited anything but a very restricted distribution,[47] probably on the ground that the author might be content with his common-law copyright, which is not limited by time, instead of dedicating his information to the public in exchange for federal copyright protection, which is limited in duration.[48]

The instant case presented just such an unlimited distribution. While no doubt Beardsley could argue that he sought criticism on his first 100 copies of his explanation and forms, and that many subscribers to his plan made changes in the wording, the fact remains that his plan had been formulated by this time and that three companies had adopted it. Moreover, the copies were available to all who might be interested, and Beardsley, far from being averse to his distributees' showing his forms to other interested parties, seemed anxious for wide consideration of his papers since thereby he was building up an impressive surety brokerage business. Thus I have no difficulty in finding that under federal law Beardsley forfeited his right to copyright.[49]

New York law gives the defendant even less solace. There is no talk of double standards, and, in fact, it has been stated that common-law protection is lost by the same circumstances which would be tantamount to a publication general for the purpose of federal protection.[50] Accordingly, I find that defendant forfeited his common-law copy-

tieth Century-Fox Film Corp., D.C. S.D.N.Y.1946, 67 F.Supp. 736, 739; cf. Falk v. Gast Lith. & Eng. Co., 2 Cir., 1893, 54 F. 890 (minatures of photos to be sold distributed to merchants but not to public, held, limited publication). But cf. Gottsberger v. Aldine Book Pub. Co., C.C.D.Mass.1887, 33 F. 381 (purchase of copy by potential customer makes distribution general); Larrowe-Loisette v. O'Loughlin, C.C.S.D.N.Y.1898, 88 F. 896, 898 (potential customers not restricted in number, held, general publication); White v. Kimmel, 9 Cir., 193 F.2d 744, certiorari denied 1952, 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357 (same); Jewelers' Mercantile Agency v. Jewelers' Weekly Pub. Co., 1898, 155 N.Y. 241, 49 N.E. 872, 41 L.R.A. 846 (same) (common-law copyright destroyed by making copies available for loan to anyone interested).

45. See Nutt v. National Inst., Inc., for the Imp. of Memory, 2 Cir., 1929, 31 F.2d 236; Bartlette v. Crittenden, C.C.D. Ohio 1847, 2 Fed.Cas. page 981, No. 1,-082; cf. Schellberg v. Empringham, D.C. S.D.N.Y.1929, 36 F.2d 991 (medical writings explaining doctor's treatments); Ferris v. Frohman, 1912, 223 U.S. 424, 32 S.Ct. 263, 56 L.Ed. 492 (public performance of a play not a general publication since audience has no right to reproduce); McCarthy & Fischer, Inc., v.

White, D.C.S.D.N.Y.1919, 259 F. 364 (same). But cf. White v. Kimmel, note 44, supra (pamphlets distributed to all those interested in author's philosophy, held, general publication); Larrowe-Loisette v. O'Loughlin, note 44, supra (distributees similarly not restricted in number, held, general publication).

46. See cases cited in notes 42-45, supra; see also Werckmeister v. American Lith. Co., 2 Cir., 1904, 134 F. 321, 325.

47. See cases cited as "But cf." in note 44, supra.

48. See Jewelers' Mercantile Agency v. Jewelers' Weekly Pub. Co., note 44, supra, 155 N.Y. at pages 247-250, 49 N.E. at pages 873-875.

49. See American Visuals Corp. v. Holland, note 30, supra, 239 F.2d at page 745.

50. Jewelers' Mercantile Agency v. Jewelers' Weekly Pub. Co., note 44, supra; Wright v. Eisle, 2d Dept.1903, 86 App. Div. 356, 83 N.Y.S. 887; Potter v. McPherson, 1st Dept. 1880, 21 Hun. 559; cf. Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 1950, 199 Misc. 786, 798-799, 101 N.Y.S.2d 483, 494, affirmed per curiam, 1st Dept.1951, 279 App.Div. 632, 107 N.Y.S.2d 795 (public radio performance not a general publication).

right and thus cannot claim federal protection.

## IV—Unfair Competition

 Defendant, in addition to claiming copyright infringement, has also counterclaimed on the theory of unfair competition. His proof indicates no interference with contractual or confidential relations, nor does it show that plaintiff was passing off its product as defendant's. Indeed, it essentially does not differ from that which he introduced to prove copyright infringement. Nevertheless, Beardsley urges this claim, relying on the International News Service v. Associated Press doctrine of misappropriation.[51] This doctrine holds it unlawful for a business, without proper efforts of its own, to capitalize on the

expenses and endeavors of another. The rule has arisen from situations where there has been interference with intangible rights connected with news reporting and radio broadcasting.

 The matter is, of course, one of state law which is entertained in this court because of diversity of citizenship of Beardsley and Continental, or because it is joined with a substantial and related claim under the copyright laws.[52] However, the source of law authoritative for a federal court has been questioned, especially where the claim of unfair competition is related to a federal trademark matter.[53] The issue is a complex one, and even if state law is authoritative, it is by no means clear that the federal courts will always be bound by the rigidities of the Erie doctrine.[54]

---

51. 1918, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211. See also Associated Press v. K. V. O. S., 9 Cir., 1935, 80 F.2d 575, reversed on jurisdictional grounds 1936, 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183; Metropolitan Opera Ass'n v. Wagner, note 50, supra; cf. Nikanov v. Simon & Schuster, D.C.S.D.N.Y.1956, 144 F. Supp. 375, 379.

52. See 28 U.S.C. § 1338(b) (1952); Hurn v. Ousler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 S.Ct. 1148. The latter ground of jurisdiction is known as pendent jurisdiction.

53. See 60 Stat. 441 (1946), 15 U.S.C.A. § 1126(h); Maternally Yours, Inc., v. Your Maternity Shop, Inc., 2 Cir., 1956, 234 F.2d 538, 540, note 1 and concurring opinion at page 545; National Fruit Product Co. v. Dwinell-Wright Co., D.C. D.Mass.1942, 47 F.Supp. 499, 503-504, affirmed 1 Cir., 1944, 140 F.2d 618; Hart & Wechsler, The Federal Courts and The Federal System 809 (1953); Note, The Choice of Law in Multistate Unfair Competition: A Legal Industrial Enigma, 60 Harv.L.Rev. 1315 (1947); Note, Federal Jurisdiction over Unfair Competition, 37 Minn.L.Rev. 268 (1953).

54. Erie Ry. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. The law of unfair competition has largely been developed in the federal courts, and most unfair competition cases are still brought there. Since Erie, however, many of the federal courts have felt compelled to ignore their own precedents and rely instead on old state decisions.

The result, as can be seen from reading the federal cases cited in support of Illinois law, notes 55–57, infra, is an endless exegesis on a perhaps antiquated decision instead of a dynamic approach to decisional law. But see New York cases cited in notes 59–67, infra; see also National Fruit Product Co. v. Dwinell-Wright Co., note 53, supra. If the federal courts also feel themselves bound to follow the conflicts of laws rules of the state in which they sit, see Klaxon Co. v. Stentor Elec. Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477, they might be further tying the Gordian knot of interstate conflicts jumbles. Cf. note 39, supra.

Besides the interstate nature of many of these unfair competition litigations, there is another element of disparity between them and the ordinary diversity cases. A good many unfair competition claims are pendent to substantial and related claims under the federal copyright, patent and trademark laws. The different venue statutes, and perhaps requirements which govern them, See Note, Doing Business as a Test of Venue and Jurisdiction over Foreign Corporations in the Federal Courts, 56 Col.L. Rev. 394, 411, 413–16 (1956), as well as their close connection with federal claims, might make it unfair to extend to them a priori the normal rules for diversity cases. Perhaps a greater flexibility in following state decisional law than is otherwise thought to be proper for a federal judge in a diversity case, cf. Pulson v. American Rolling Mill Co.,

Unfortunately, these issues were not briefed or argued by the attorneys,* and since the substantive issue is settled in the same fashion in all three of the possibly applicable jurisdictions, Illinois, New York and Federal, I believe that their decision might await a more propitious instant.

In Illinois, an unfair competitor is one who causes the consuming public to confuse his product with the products of another.[55] While Illinois has modified its earlier requirement that only the "palming off" of one's goods as those of his competitor can constitute this tort,[56] the requirement of confusion remains a categorical imperative.[57] Under this view defendant cannot prevail, for plaintiff has taken great pains to avoid any possible suggestion that its plan had anything to do with Mr. Beardsley's plan.

The law of New York is somewhat more liberal than that of Illinois. "Palming off" and "confusion" are not the sole criteria for finding unfair competition, as the tort has also been found from other circumstances. Thus, the doctrine of International News Service v. Associated Press,[58] has been applied to unauthorized recordings and re-broadcasts taken from radio broadcasts,[59] to appropriation of comic strip characters identified by the public with their creator,[60] and to a motion picture which was intended to capitalize on a public interest in the events taking place in a particular sporting arena.[61] In a very recent case, where a complaint was held to state a valid cause of action, the doctrine was extended to cover the unauthorized dissemination, by one given access under an understanding of confidence, of original fashion creations.[62]

1 Cir., 1948, 170 F.2d 193, might be achieved in this area by presuming that the state courts would amend an old precedent by developments in the law of unfair competition in the federal courts and in other jurisdictions. See National Fruit Product Co. v. Dwinell-Wright Co., note 53, supra. Flexibility might also be achieved by using the distinction of pendent from diversity jurisdiction as a basis for adopting a federal courts law of conflicts, which, in turn, might support a freer choice in choosing precedents.

* A very tardy reply brief submitted by defendants after this opinion was written does touch upon the point but does not affect my conclusions.

55. Lady Esther, Ltd. v. Lady Esther Corset Shoppe, Inc., 1943, 317 Ill.App. 451, 46 N.E.2d 165, 148 A.L.R. 6; Independent Nail & Packing Co. v. Stronghold Screw Products, Inc., 7 Cir., 205 F.2d 921, certiorari denied 1953, 346 U.S. 886, 74 S.Ct. 138, 98 L.Ed. 391; Elastic Stop Nut Corp. v. Greer, D.C.N.D.Ill. 1945, 62 F.Supp. 363.

56. Compare Lady Esther, Ltd. v. Lady Esther Corset Shoppe, Inc., note 55, supra, with Stevens-Davis Co. v. Mather & Co., 1923, 230 Ill.App. 45; see De Long Hook & Eye Co. v. Hump Hairpin Mfg. Co., 297 Ill. 359, 130 N.E. 765; Time, Inc., v. Viobin Corp., 7 Cir., 128 F.2d 860, certiorari denied

1942, 317 U.S. 673, 63 S.Ct. 78, 87 L. Ed. 540; Addressograph-Multigraph Corp. v. American Expansion Bolt & Mfg. Co., 7 Cir., 1941, 124 F.2d 706, certiorari denied 1942, 316 U.S. 682, 62 S.Ct. 1270, 86 L.Ed. 1755; cf. Soft-Lite Lens Co. v. Ritholz, 1939, 301 Ill.App. 100, 21 N.E.2d 835.

57. See Lady Esther, Ltd. v. Lady Esther Corset Shoppe, Inc., note 55, supra 317 Ill.App. at page 454, 46 N.E.2d at page 167; and other cases cited in note 55, supra. Proof that the public is likely to be deceived seems to be sufficient. See Independent Nail & Packing Co. v. Stronghold Screw Products, Inc., note 55, supra, 205 F.2d at page 926 (dictum).

58. See note 51, supra.

59. Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 1950, 199 Misc. 786, 101 N.Y.S.2d 483, affirmed 1st Dept. 1951, 279 App.Div. 632, 107 N.Y.S.2d 795; Mutual Broadcasting System, Inc., v. Muzak Corp., 1941, 177 Misc. 489, 30 N.Y.S.2d 419; National Exhibition Co. v. Fass, Sup.1955, 143 N.Y.S.2d 767.

60. Fisher v. Star Co., 1921, 231 N.Y. 414, 132 N.E. 133, 19 A.L.R. 937.

61. Madison Square Garden Corp. v. Universal Pictures Co., 1st Dept.1938, 255 App.Div. 459, 7 N.Y.S.2d 845.

62. Dior v. Milton, Sup., 155 N.Y.S.2d 443, affirmed App.Div.1st Dept.1956, 156 N.Y.S.2d 996.

■ In all of these cases the holding is partly based on the theory that one cannot appropriate the property of another. However, it is clear that unfair competition will not be found on merely this circumstance. The preceding cases contained features of deception—the appropriator seeking to capitalize as well on the reputation of the aggrieved original sponsor of the product or service.[63] Moreover, the decisions also are based partly on interferences with contractual relations affecting exclusive rights to intangibles.[64] Thus, in Metropolitan Opera Ass'n, Inc., v. Wagner-Nichols Recorder Corp.,[65] one who recorded and sold the radio broadcasts of "live" Metropolitan opera performances was enjoined from continuing this activity. The court based its conclusion on appropriation of another's effort, on the public being deceived as to the quality of the recorded performances, and on the resulting interference with the Metropolitan Opera Association's contracts with radio broadcasting and recording companies. The same elements were present in Dior v. Milton.[66] When only appropriation of another's efforts is involved, and the other elements are not present, the New York courts refuse to find unfair competition.[67]

■ The instant case clearly cannot be subsumed under the New York desiderata for unfair competition. Not only is the proof deficient of Continental's appropriating Mr. Beardsley's forms, but there is not a shred of evidence indicative of a belief that Continental was being helped by Mr. Beardsley's business reputation. Moreover, Mr. Beardsley had no exclusive interest in his idea or in his product with which Continental might have interfered.

In the federal courts, the doctrine of International News Service v. Associated Press [68] seems to have been even further restricted. Except for a very similar fact situation,[69] the case has never been extended. Thus, Judge L. Hand [70] described the International News Service case as holding "no more than that a western newspaper might not take ad-

---

63. See Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., note 59, supra; Fisher v. Star Co., note 60, supra; Dior v. Milton, note 62, supra.

64. See National Exhibition Co. v. Fass, note 59, supra; Madison Square Garden Corp. v. Universal Pictures Co., note 61, supra; cf. De Jur-Amsco Corp. v. Janrus Camera, Inc., Sup.1956, 155 N.Y.S. 2d 123 (interference with an exclusive dealership arrangement).

65. Note 59, supra.

66. Note 62, supra; see also Varsity Sportswear, Inc., v. Princess Fabrics Co., 1940, 174 Misc. 298, 19 N.Y.S.2d 723.

67. Pocket Books, Inc., v. Meyers, 1944, 292 N.Y. 58, 54 N.E.2d 6; Hebrew Pub. Co. v. Scharfstein, 1942, 288 N.Y. 374, 43 N.E.2d 449; Germanow v. Standard Unbreakable Watch Crystals, Inc., 1940, 283 N.Y. 1, 27 N.E.2d 212; United Merchants & Mfrs., Inc., v. Bromley Fabrics, Inc., Sup.1955, 148 N.Y.S.2d 22; American Merri-Lei Corp. v. Jet Party Favors, Inc., Sup. Kings County 1953, 123 N.Y.S.2d 136; Mavco, Inc., v. Hampden Sales Ass'n, Inc., 1st Dept.1948, 273 App.Div. 297, 77 N.Y.S.2d 510; Archie Comic Pub., Inc., v. American News Co., 1953, 204 Misc. 1060, 125 N.Y.S.2d 919, affirmed 1st Dept.1954, 283 App.Div. 868, 129 N.Y.S.2d 915.

68. See note 51, supra.

69. Associated Press v. K. V. O. S., note 51, supra.

70. See RCA Mfg. Co. v. Whiteman, 2 Cir., 114 F.2d 86, 90, certiorari denied 1940, 311 U.S. 712, 61 S.Ct. 393, 85 L.Ed. 463; see also G. Ricordi & Co. v. Haendler, 2 Cir., 1952, 194 F.2d 914; National Comics Pub., Inc., v. Fawcett Pub., 2 Cir., 1951, 191 F.2d 594, 603; Millinery Creators' Guild v. F. T. C., 2 Cir., 1940, 109 F.2d 175, 177, affirmed 1941, 312 U.S. 469, 61 S.Ct. 708, 85 L.Ed. 955; Alexander v. Irving Trust Co., D.C.S.D. N.Y., 132 F.Supp. 364, affirmed 2 Cir., 1955, 228 F.2d 221, certiorari denied 1956, 350 U.S. 996, 76 S.Ct. 545, 100 L.Ed. 860; Aldrich v. Remington-Rand, Inc., D.C.N.D.Tex.1941, 52 F.Supp. 732; cf. Nikanov v. Simon & Schuster, Inc., D.C.S.D.N.Y.1956, 144 F.Supp. 375, 379 (infringement of common-law copyright spells out a claim for unfair competition so as to be within pendent jurisdiction of district court).

vantage of the fact that it was published some hours later than papers in the east, to copy the news which the plaintiff had collected at its own expense. In spite of some general language it must be confined to that situation (Cheney Bros. v. Doris Silk Corp., 2 Cir., 35 F.2d 279, 281); certainly it cannot be used as a cover to prevent competitors from ever appropriating the results of the industry, skill, and expense of others. * * In the case at bar if [plaintiffs] cannot bring themselves within the law of common-law copyright, there is nothing to justify *a priori* any continuance of their control over the activities of the public to which they have seen fit to dedicate the larger part of their contribution." Accordingly, Beardsley cannot prevail on a theory of unfair competition.

Beardsley has also counterclaimed on a theory of breach of confidences and of implied contracts. There is insufficient proof to substantiate these claims.

Continental, in addition to its action for a declaratory judgment that the Beardsley plan was not copyrightable nor infringed, also has sued for damages on the theory of unfair competition and violations of the anti-trust laws. Both of these last two causes of action have not been proved and they must be dismissed.

██ Defendant for many years has used assertions that his system was copyrighted as a business expedient. He has also stated that he would not desist from such assertions unless his copyright were to be invalidated by a court of last resort.[71] Unless Beardsley is restrained from making these assertions, Continental's business will continue to suffer substantial damage. Not only is it likely that business will be lost to it, but Continental would be compelled to engage in a multiplicity of suits in order to vindicate its position. Moreover, the difficulty of proving the proximate cause for not gaining or for losing a particular source of business makes a suit for damages an inadequate remedy. For these reasons, and since there is no merit in the defendant's position, defendant should be restrained from claiming a copyright on his plan or on any of his forms and from distributing any of his forms which purport to be copyrighted.

Plaintiff is directed to submit a form of judgment on notice.