## MacDONALD v. DU MAURIER et al.

District Court, S. D. New York.

Jan. 14, 1948.

See, also, 75 F.Supp. 653.

Charles S. Rosenschein, of New York City (Charles S. Rosenschein and Arthur L. Ross, both of New York City, of counsel), for plaintiff.

Beekman & Bogue, of New York City, (Arthur E. Farmer, Edward K. Hanlon and Benjamin H. Stern, all of New York City, of counsel), for Doubleday Doran & Co., Inc.

O'Brien, Driscoll & Raftery, of New York City (Arthur F. Driscoll, of New York City, of counsel), for Selznick International Pictures, Inc., David O. Selznick, David O. Selznick Productions, Inc., and United Artists Corporation.

BRIGHT, District Judge.

This action is one seeking a judgment for an alleged infringement of copyrights. Edwina Levin MacDonald, originally the plaintiff, has died since the commencement of the action and her ancillary administrator has been substituted. In her lifetime she wrote "I Planned to Murder My Husband", a confession story published in this country in Hearst's International Magazine of October, 1924. She incorporated that story in the novel "Blind Windows", which was published by the Macauley Company, in New York, in 1927.

In 1938, the novel "Rebecca", written by the defendant Daphne DuMaurier, an English authoress, was published in this country by the defendant Doubleday Doran & Company, Inc. In 1939 it was made into a motion picture by the same name, produced by the defendants Selznick International Pictures, Inc. and David O. Selznick, Inc., and, in March 1940, released and distributed for exhibition by the defendant United Artists Corporation.

Plaintiff claims, and defendants deny, that "Rebecca" infringes the copyrights of "I Planned to Murder My Husband" and "Blind Windows", that the defendant DuMaurier had access to Mrs. MacDonald's

works, and has substantially copied the same. A list of some 46 parallelisms is submitted by plaintiff as illustrative of the claimed plagiarism.

"I Planned to Murder My Husband", written in the first person, purports to detail the feelings and experiences of a 16 year old unnamed girl, who, three months after graduation from a finishing school, marries Howard, a divorced man, 31 years old, of distinct Latin type. She goes to his home and sees there the furnishings, wedding presents, ornaments and servants of Della the first wife. Frequent references to her by the husband, servants and friends, and the surroundings in the home, engender a bitter jealousy of the first wife and hate for the husband and the thought that he still loved Della. The second wife's hate is further inflamed by Howard's cruel and vicious nature and violent temper, and she reaches the conclusion that her only salvation lies in her husband's death. Nearing the hour when this is to be accomplished, she entertains many at her "Farewell Party", and later dreams that she has accomplished his death. The shock wakes her. Her hysterical pouring out of the dream and her long months of suffering convinces her husband of her love for him, causes him to confide in her that he had wearied of his first wife and finally, because of her fickleness and public misbehavior, had divorced her. Shortly afterwards he dies, she finds out he had nothing, was not rich, only the son of a rich man, and she leaves the home. Later she meets the first wife and then discovers how futile had been her passion. The story ends without climax. It later developed in the deposition of Mrs. MacDonald, taken in this action, that the story is really a partial autobiography of her life.

"Blind Windows" concededly is "I Planned to Murder My Husband", amplified and embellished. The first 200 pages are devoted to the life of the second wife, now identified by the name of Wilda Garnett, prior to and including her marriage and honeymoon, and her acquaintance with Ned Turner, a boy neighbor, which really has ripened into love. She is introduced by him to Vallon Dupré, about 35, French, and divorced. Between pages 200 and 361 is found the first story, in more detail, the first wife being named Ida, and expanded from a confession story into a novel, and which also ends without a climax. The balance of the book takes her back to Ned and a renewal of the acquaintance between them.

"Rebecca" is written in the first person, the narrator never being identified other than by "I". She is 21 and employed as a companion of Mrs. Van Hopper. While at Monte Carlo with Mrs. Van Hopper she is introduced to Max deWinter, an Englishman, about 42, who had been previously married and whose wife, Rebecca, is said to have been drowned. They are married after a short acquaintance, and following a honeymoon in Italy, he takes her to Manderley, his manor house in England. There she meets, among others, Mrs. Danvers, the housekeeper, devotedly attached to the first wife, who obviously resents what she deems the intrusion of the second wife; and who finally almost causes "I" to commit suicide. The story is climaxed in the discovery of the body of the first wife in her boat sunk in the bay near Manderley, the confession by deWinter to "I" that he had murdered her, a coroner's inquest at which there is a finding of the first wife's suicide, the burning of the manor house, perhaps by Danvers, and the subsequent quiet and contented life of "I" with her husband.

This action has already felt the impress of judicial decision. A motion for judgment on the pleadings was made by the defendant Doubleday, which was granted, Judge Bondy holding that the two stories were different, and that, although there were many similarities, they were suggested by the basic plot and environment and did not constitute a substantial and material part of the copyrighted matter in plaintiff's story. Upon appeal, the Circuit Court reversed, 2 Cir., 144 F.2d 696, 700, in an opinion by Judge Swan, concurred in by Judge L. Hand, Judge Clark dissenting. Both sides take comfort from what was there written. What was then actually decided was that, because on such a motion access and copying must be assumed and conceded, the question remaining was whether the borrowing was a "fair use", the determination of which required that plaintiff have her day in court. Judge Swan wrote: "Because of the way the case came on—a motion for

judgment on the pleadings—we must assume not only that the author of the book charged with infringing had access to the plaintiff's copyrighted works but also that she actually copied those parts common to both. * * * If so the only answer to the charge of tortious plagiarism must be that the common matter was either in the public domain or was so trifling as not to count. * * * Even though some of them (the similarities) may be far fetched, for example, the reference to trees looking like sentinels, so many remain that the common matter is not so trifling that it can be ignored. Consequently the question comes down to whether the author's borrowing, although substantial in amount, was a 'fair use.' That is always a troublesome question. In the case at bar the supposititious borrowings are not in the general outline of plot and character: in 'ideas' as opposed to 'expression.' On the contrary they consist in a series of concrete incidents and details, and if in fact these were all borrowed from the plaintiff, we cannot properly hold that the common matter was outside the protection of the copyright law."

Obviously the Circuit Court did not intend to decide, or to eliminate for decision by this court, the issues of access and copying. Another portion of the prevailing opinion, to which my attention has been directed by defendant's counsel, contains statements which are obviously obiter.

After the reversal, the same defendant moved for summary judgment, apparently adopting the suggestion made in the prevailing opinion on appeal, that upon such a motion it might be satisfactorily established that there was neither access nor copying. However, the motion was denied, D.C., 75 F.Supp. 653, Judge Bondy holding that from the circumstantial showing then made, the trier of the issues might reasonably infer Daphne DuMaurier had access to plaintiff's copyrighted works, and defendant's denial of such presented a question of fact to be determined only after a full review of the evidence.

I have above skeletonized most briefly the three stories, principally to make this opinion more understandable. Judge Bondy, on the first motion, much more capably and completely reviewed them. The Circuit Court in 144 F.2d at page 700, wrote that his opinion "admirably outlines the stories of the two books", a conclusion concurred in by all three judges as well as myself. His opinion, published with that of the Circuit Court, states that "I Planned to Murder My Husband" is substantially enlarged and embellished in "Blind Windows" and need not be considered separately. In what further is written I will assume familiarity with that outline. Without reference to it, this opinion would be most incomplete.

The questions now to be determined are, (1) whether the defendant DuMaurier, in writing "Rebecca" had access to "I Planned to Murder My Husband", or "Blind Windows", and (2) whether she copied a substantial part of the copyrightable portions of either or both. On both my decision is in favor of defendants on the law and the facts.

Plaintiff's proof of access is entirely circumstantial. The facts shown, except the ultimate one that Miss DuMaurier ever saw or heard of either the book "Blind Windows" or the story "I Planned to Murder My Husband", are uncontradicted.

As stated before, "I Planned to Murder My Husband" was published in 1924 in this country in Hearst's International Magazine. It was never published in England, although Hearst did publish there two other magazines. Miss DuMaurier was 17 years old in 1924 and had not yet submitted any of her writings for publication. She was born in England, has always resided there, and had never been to this country until the trial of this action. She had been writing poems and short stories since she was 14, and apparently had been an avid reader both of books, magazines and other publications, including anthologies. "I Planned to Murder My Husband" was considered by the Hearst editors as an outstanding example of a confession story and was shown from time to time to aspiring authors here and in England to illustrate the way in which such a story would be suitable to the Hearst organization for publication.

The story was included in the anthology, "As I Look At Life", published by a Hearst subsidiary in 1925. One hundred thousand

copies were printed and distributed free as a premium to persons who subscribed to the Cosmopolitan Magazine, also published in this country by Hearst's International. It is not shown that "As I Look At Life" was ever distributed in England.

The Hearst organization had offices in England, and its representative there was under a duty to obtain literary material, in the form of short stories, novelettes and fiction, from English authors for publication in this country in Hearst's International and Cosmopolitan. The Hearst representatives in England from 1925 until August, 1931, were Mr. Lengel and Miss Mildred Temple, and they testified they had a copy or copies of "I Planned to Murder My Husband" and of the anthology in London and did show the story to prospective contributors; but neither testified that they had met Miss DuMaurier. One of them stated that copies of Hearst's American Magazines were on sale in England, but it was not shown when, how many copies, what issues, or whether any of them contained the story "I Planned to Murder My Husband".

"Blind Windows", as previously stated, was published in New York in 1927, and about 3500 copies were printed. What became of them is not shown. In 1927, English publication rights in that book were sold by The Macauley Company through Curtis Brown, literary agents, with offices in London and New York, to John Long, Ltd., an English publisher. The book was published in England in March, 1928. Apparently 1184 copies were printed, of which 337 were sold in England and 44 in the English colonies. What became of the remaining 803 is not shown, except that one of the witnesses stated that they were probably reduced to pulp. The American book department of Curtis Brown, of which Laurence Pollinger wás the head, handled the sale of the rights in the book to Long. He denied ever having seen or read the book.

A review of that novel was published in London in the Times Literary Supplement on Thursday, May 10, 1928. But a reading of that review would not reveal a story similar to that outlined by Judge Bondy, or even that it was a "second wife" plot. Miss Du-

Maurier admitted that she occasionally read book reviews in the Sunday London Times literary supplement, but denied that she read the Thursday supplement. In 1928 she was 21, and, aside from her denial, it is difficult to understand how a reading of that review would either have furnished her with material for "Rebecca", which she did not commence to write until 1937, or which would have enticed her to read "Blind Windows" by the half praise contained in it— "Some care has been taken with the book, but it rarely leaves the gentle, sentimental plane."

The first poem written by Miss DuMaurier—"The Old Ship"—was published in London in 1928 or 1929, in her uncle's publication "The By-Stander". She retained Curtis Brown, Ltd. of London, previously mentioned, as her literary agents in England in the summer of 1929, and in America in 1930. She also retained Stern & Rubins, attorneys in New York, to take care of some of her legal matters in this country in 1938, and this firm acted as counsel for the defendant Doubleday during the progress of this litigation.

She wrote her first novel, "The Loving Spirit", in 1929 and it was published in 1931 in England. On May 13, 1931, Miss Du-Maurier sold a short story, entitled "A Symphony On Paper", for publication in Hearst's Cosmopolitan in New York, and it was published in the September, 1931, number of that magazine under the title "His Letters Grew Colder". A manuscript card, kept in the files of Hearst's International Magazine, revealed this transaction in May, 1931, and that the payee for the story was the defendant DuMaurier, the check to be sent to London, care of Mildred Temple, Hearst's London representative. It was shown that only in instances where Miss Temple dealt directly with the author would the check come to her; that if the story was purchased through an agent, the check would be made to the author and sent to the agent. Miss Temple had no recollection of ever having met Miss DuMaurier, but the production of this card caused her to wonder if she had not; and Mr. Lengel testified that the story came from England and his best guess was that it came from Mil-

dred Temple; that the manuscript card revealed that Miss Temple must have gotten the manuscript herself, sent it over and requested that the check be sent to her. It was shown that Miss Temple had dealings once or twice a week with Nancy Pearn, who was at the head of the department of Curtis Brown in London which had charge of the sale of stories for magazines, and that from time to time Miss Temple showed to Nancy Pearn copies of stories published in Hearst's American Magazine, to suggest a way that stories might be purchased by the Hearst organization; and "I Planned to Murder My Husband" was so shown as such a sample. It did not appear, however, that any copy of that story was ever shown to Miss DuMaurier.

Miss DuMaurier was acquainted with Michael Joseph and Nancy Pearn, and had met the latter when she took stories to her in the hope that they would be placed for publication. She was also well acquainted with Edgar Wallace, an English writer of mystery stories, and had read many of his books. Mr. Wallace's daughter Pat was one of her great friends, and she had frequently visited at their house and traveled with them to Europe on several occasions. It appeared that in two or three of the books written by Edgar Wallace and published by John Long, Ltd. in England, were pages which advertised other publications of John Long, among which was "Blind Windows", but Miss DuMaurier denied that she had seen these books or advertisements.

Miss DuMaurier testified that she began thinking about the novel "Rebecca" in 1932, actually started the writing of it at Alexandria, Egypt, in 1937, and finished it in April, 1938; and that it was the product of her imagination, some of the scenes and incidents being founded upon her own home, known as Menabilly, in Cornwall, England, and other large residences in other parts of England, and upon legends and occurrences connected with some of these homes. After finishing the writing of the book, she handed the manuscript to Michael Joseph, who was not then connected with Curtis Brown. At her request, Mr. Joseph delivered the manuscript to her publisher without revision, and it was later published by Victor Gollantz, Ltd. in England, and by Doubleday in the United States in 1938. It was an immediate success, and in three years after its publication, had sold over 400,000 copies. She categorically denied that, although she had read many novels and short stories, she had ever read Hearst's International Magazine, that she had ever met or heard of Mrs. MacDonald; or had ever heard of or read "I Planned to Murder My Husband" or "Blind Windows" until after this action had been commenced. She further testified that "Rebecca" was entirely original with her, that no one had suggested any part of it to her, originally or for correction, and that the book was the product of her imagination without suggestion or copying from any other person or publication.

Plaintiff contends that access is shown by the foregoing proven facts, and by the further proof that Miss DuMaurier admitted that from the time she was 14 she had read many books, some of which were "second wife" stories, but the only one she could recall was "Jane Eyre" which proved not to be such a story. From this the conclusion is said to be inevitable that the "second wife" story she did read was "Blind Windows", and that this is confirmed by the 46 similarities which plaintiff claims exist and which are adequately described in Judge Bondy's opinion previously cited.

■ The circumstances shown do not inevitably lead to the conclusion of access, and the inferences and presumptions arising from them are as susceptible of the contrary. The denial of access made by the defendant, her proven reputation as a writer, and a reading of the three stories, have convinced me that she never saw or heard of "I Planned to Murder My Husband" or "Blind Windows" prior to the writing or publication of "Rebecca". There was nothing in her testimony which seemed to me false or improbable, and I accept it.

■ Ordinarily, the failure of proof of access would be a complete answer to plaintiff's contentions. But in view of the similarities claimed to exist between the two books, said to be evidence of copying, and assuming arguendo that there is error in my finding of non-access, the question remaining is whether or not there was copy-

ing of substantial copyrightable material, which, of course, is essential in order that there be infringement.

■ Reference is again made to the opinion of Judge Bondy as well as those of the Circuit Judges printed in 144 F.2d 696. Every Judge who has considered the matter of copying has written adversely to the plaintiff's contention. Because of the insistence of plaintiff's counsel that what was written in the Circuit Court upon that subject was entirely unnecessary for the decision of the question there presented, and the earnest argument based upon the parallelisms claimed as well as the proof, said to show access, I have read and reread the three stories in conjunction with the voluminous testimony and exhibits introduced upon the trial, and I am convinced that there was no copying. In my opinion, not only is the handling of the plot or theme different, and the characters and incidents unlike, but also the readability of the two books inducing interest and a desire to finish, demonstrate the entire failure to show any literary piracy. Judge Clark has much more capably expressed what is in my mind. He comments in his dissenting opinion upon the sharp differences between the two stories in "intended objective and type of reader appeal, in fashioning of the plot and in its progression, in the inception and delineation of characters, in the climax of the story and denouncement of the plot, and in the effectiveness and, certainly in part at least, in the literary skill with which the chosen objective is reached."

The similarities claimed are completely set out in Judge Bondy's opinion and his statement of them is to some extent adopted by the prevailing opinion of the Circuit Judges. I need not further refer to them except to suggest that the "second wife" plot and her coming into the former wife's home and being reminded of the first wife by the surroundings and conversation of servants and acquaintances would not ordinarily, and are not now contended to, be copyrightable or the subject of tortious plagiarism. As I understand it, plaintiff does not charge that the theme was improperly taken, only that details, incidents, similarities of locale, and characters were lifted.

A large bulk of the parallelisms asserted naturally flow from the basic plot, are an integral part of it, and would naturally be expected to be included in such a story, written, as both were, by ladies with their intuitive analysis of the emotions, thoughts and introspection of their own sex under like conditions.

Obviously the source of the material for "Rebecca" was entirely different from the source of that for the other publications. Mrs. MacDonald was writing of her personal experiences set out baldly in the first story and more fictionally amplified to a great extent in the second. Rebecca's theme was based upon imaginary lives. The ghost of Ida, the first wife in plaintiff's works, plus the actions of the husband, motivated the desire in the second wife to murder her husband. The murder in "Rebecca" was that of Rebecca, the first wife, and its concealment by the husband was the cause of his peculiar demeanor and actions so inexplicable to the second wife. Whatever emotions are aroused in the second wife by her thoughts of the first wife are seemingly unintentionally caused in plaintiff's stories; while those in "Rebecca" are vindictively and intentionally provoked by Mrs. Danvers. Vallon was rid of his first wife by a questionable divorce; deWinter assured his first wife's elimination by just shooting her. Wilda was freed of her entangling alliance by the death of Vallon; "I", to the contrary, was assured of a continuance of their mutual devotion by the confession of deWinter, his subsequent acquittal of responsibility, and the destruction of the home. Ida proved herself to be the contrary of what Wilda's thoughts had erected; Rebecca's devilishness was revealed in the dramatic story of her destruction. Vallon's house remained as his first wife had left it; Manderley was changed so that the second wife and deWinter would not occupy his first wife's boudoir, obviously to eliminate the necessity of deWinter's entering surroundings hateful to him. The basic thought of the theme in "Blind Windows" is presented in its very title. Throughout its context, the idea of the authoress was to picture characters whose minds were separate houses having tightly shuttered windows, concealing from outsiders the turbulent life within; the de-

sire to portray the emotions and impulses that carried on behind these closed windows; and the closing of the shutters of their secret house by the actors in the story. All that was concealed in "Rebecca" was a crime, which deWinter had confessedly committed, and which accounted for the behavior, which "I" did not understand, until it was revealed.

And the characters in the two stories are different. Wilda was clearly dominated first by her desire to outdo her girl friends and to attract from them the male in their midst; "I" is not revealed to have had any such disposition, and had no opposition in the affections of deWinter. Clearly Wilda was intensely jealous and that temperment ruled her very existence; there is little, if any, showing of that in "Rebecca". Wilda ensnared herself in a marriage to a virtual stranger, and one which she did not love, by a silly adherence to what is described as a Garnett trait, never to break a promise or change a decision; "I" devotedly loved deWinter and was impelled by no other thought in her marriage. Wilda revelled in dress and her honeymoon was a "perfect orgy in pretty clothes"; not so "I", whose dress was the opposite. Wilda had already fallen in love with Ned, but there was no divided affection so far as "I" was concerned. Wilda's father did not tell her not to marry, as did Mrs. Van Hopper. The reasons given why marriage was inadvisable were entirely different in the two stories; Wilda's father emphasized the disparity of age, the impossibility of mental affinity, the French and, therefore, different point of view of Vallon, his fixed ideas and the fact that Wilda's were in the making, that Dupré had lived and that Wilda had been trained merely to think, and the consequent impossibility of Wilda's leaping over what had already been experienced by Dupré. Mrs. Van Hopper's reason, aside from her obvious personal pique because of not being consulted, was that "I's" sheltered life had illfitted her to be the mistress of Manderley, she had not the experience; "You don't know that milieu". Wilda's married life seems to have been dominated by thoughts of the absent wife so that they became an obsession, and she sought refuge, of all places, in reading Boccaccio. "I's" mental

discomforts seem to have spurred her on to love deWinter more and to do what she could to accomplish that. Wilda, the first night of her coming into the home, knew that she hated her husband, her expectations of a child definitely confirmed her hate, and her thoughts became homicidal. There is nothing like that in "Rebecca". Wilda's discovery of Dupré's divorce was taken by her as proof that she had been sacrificed by Dupré to be revenged on Ida for a real or fancied wrong, and which she considered as the bitterest draught and his one unforgivable sin against her. "I's" discovery of the first wife's murder removed whatever barriers existed between her and deWinter and was but an opportunity for a greater affection. And the "Farewell Party" of Wilda's, the final splurge before she was to finish off her husband, was entirely different in reason from the party portrayed in "Rebecca", which was given out of deference to the customs and traditions of the proprietors of Manderley prior to "I's" coming.

Similarly, the portrayal of the characters of Vallon and deWinter, the husband, revealed entirely different personalities. Vallon was French or Latin descent, different from that of Wilda, not easy to live with, insistent upon his wife dressing better than others, of violent temper, and inclined to dramatize himself; deWinter, to the contrary, was of the same nationality as "I", modest in the extreme, retiring, entirely satisfied with the manner in which his wife attired herself, moody because of his conscience and what had taken place with his first wife, and motivated in whatever outbursts of temper he displayed, which were infrequent, by reminders of his first wife's life, associations and death. Vallon was intensely jealous and suspicious of Wilda, and that, coupled with the jealousy of Wilda, presented a pair in whom the green eyed monster monopolized their lives almost to the destruction of both. There is no character in "Rebecca" like that of Ned Turner in "Blind Windows"; there was no other man in "I's" life. There is no child born or anticipated in "Rebecca", and no character in "Blind Windows" like the blackmailer Jack Favell in "Rebecca". Even the first wives in both stories were different. Ida in "Blind Windows" was frivolous and flirta-

tious. Her portrayal seems to be of a woman who merely excited the jealousy of her husband, but who was not promiscuous in her habits. "Rebecca", however, was confessedly an adulteress, and taunted deWinter with the possibility that any child she might bear from her illicit relations with other men would some day be the heir of all of Manderley. As I read the story, it occurred to me that "Rebecca's" sole purpose in the final interview between her and deWinter, knowing that she was to die of cancer, having been so advised by her physician, was to provoke her husband into such a rage that he would kill her and thus she would be revenged on him even after her death by having him as her murderer and suffering accordingly.

Concededly there is no such character in "Blind Windows" as Danvers, the housekeeper at Manderley. And about her revolves much of the story of "Rebecca" and the unhappy existence for a time of "I". It was not so much the fact that a first wife had existed as it was the action of Danvers who reincarnated her for her own purposes as the vehicle from which she launched her hate of the second mistress of Manderley. There is nothing in "Blind Windows" like the story of the effort that Danvers pursued to confront "I" with the first wife, no obvious plan to superimpose the dead upon the living, no clear cut hate and contempt as the base upon which to foist the first wife upon the second, no intentional effort to belittle the latter and to treat her and make her feel like an interloper, to such an extent as almost to cause her suicide. The other references of the first wife's presence in Manderley were secondary to the vindictive efforts of Danvers, who gloated in the opportunity to call to the second wife's attention everything that the first wife had, used, and did. In other words, the first wife's presence in Dupré's household was of a passive character; in Manderley the first wife was actively made to live through Danvers.

The dissimilarities between the locale, the characters and the incidents might still further be multiplied were this opinion to be extended. I am reminded by counsel, of course, that dissimilarities are not the criterion by which the question of plagiarism may be decided. But the dissimilarities in essential and most important parts of the text of the two works, in my opinion, prove that the similarities which may exist are in non-essentials and details which have no real probative bearing upon the issue to be determined. "Blind Windows" leads through a detailed and somewhat tiresome telling of the life of an immature and jealous girl, to a finale without climax and without a happy ending. "Rebecca" leads through an entirely different life, disturbed largely by the dread of a reference to the first wife or to the sea or to the bay, a mystery dark, foreboding and oppressive, to a tremendous smashing climax following upon the scene when, through the hypnotic efforts of Danvers, "I" almost jumped out of the window, the discovery of the body of the first wife, the confession of her murder, the subsequent coroner's inquest, the possible revision of the verdict of suicide by the revelation of Jack Favell, the subsequent discovery of the reason why Rebecca's death was known by her to be imminent, and the destruction by fire of Manderley, supposedly caused by Danvers, to the happy subsequent life of the two principals. In reader appeal, in description of scenes and characters, and in literary skill, there can be no claim, in my judgment, that the latter was copied from the former.

■ As "Rebecca" was not copied from "Blind Windows" or "I Planned to Murder My Husband", it follows that the motion picture, which I have viewed, produced from the DuMaurier novel was not an infringement, and its production, distribution and subsequent exhibition not tortious.

The complaint is, therefore, dismissed, upon the merits, with costs to the defendants Doubleday, Selznick and United Artists, appearing separately.

The defendants' attorneys may present findings and conclusions, a copy of which will be served upon plaintiff's attorney, who may have five days thereafter in which to file objections. The final findings and conclusions will be made by the court.