Morris Bertram BURNETT, also known as Murray Burnett, and Frederick Stephani, Plaintiffs,

v.

Salvatore LAMBINO, also known as Evan Hunter, Simon and Schuster, Inc., Metro-Goldwyn-Mayer, Inc., and Pocket Books, Inc., Defendants.

United States District Court
S. D. New York.
April 6, 1962.

Blumberg, Singer, Ross & Gordon, New York City, for plaintiffs; Leon Singer, Fred Newman, and Richard B. Rodman, New York City, of counsel.

Sam Rosenblum, New York City, for defendant Salvatore Lambino.

Philips, Nizer, Benjamin, Krim & Ballon, New York City, for defendant Metro-Goldwyn-Mayer, Inc.; Simon Rose, and Albert F. Smith, New York City, of counsel.

Brennan, London & Buttenwieser, New York City, for defendants Simon and Schuster, Inc. and Pocket Books, Inc.; Ephraim London, and Jordan Derwin, New York City, of counsel.

FEINBERG, District Judge.

This is an action for alleged copyright infringement of plaintiffs' plays by the book and motion picture "The Blackboard Jungle," which deal with the problems of a teacher in a New York City vocational high school. Plaintiffs are Morris Bertram Burnett ("Burnett"), a citizen of New York[1], and Frederick Stephani, a citizen of California. Defendants are Salvatore Lambino, who uses the pen name of Evan Hunter ("Hunter")[2], a citizen of New York, Simon and Schuster, Inc. ("Simon and Schuster"), a New York corporation, Pocket Books, Inc., a New York corporation, and Metro-Goldwyn-Mayer, Inc. ("MGM"), a Delaware corporation. The case was tried without a jury. For the reasons set forth below, defendants are entitled to a judgment dismissing the complaint.

Plaintiffs are the co-authors of a play entitled "Shadows In The City" ("Shadows"). Plaintiffs deposited a copy of "Shadows" in the Copyright Office in 1943. A Certificate of Registration of a claim to copyright as an unpublished work under 17 U.S.C. § 12 was issued May 20, 1943. Plaintiffs are also co-authors of "Hickory Stick" which they characterize as a "rewritten version" of "Shadows."[3] No copy of "Hickory Stick" was deposited in the Copyright Office nor was a Certificate of Registration of a claim to copyright ever obtained for that work. "Shadows" was not produced or exhibited in any theater in the United States or elsewhere. "Hickory Stick" was performed for one week only in May 1944, at the Mansfield Theater in New York City.

Hunter is the author of a novel "The Blackboard Jungle," published in 1954 by Simon and Schuster. In 1955, the novel was reprinted in a paperback edition by Pocket Books, Inc. Approximately two and one-half million copies of the novel were sold. In 1954, a motion picture version of Hunter's book was produced, and, in 1955, exhibited by MGM.

Plaintiffs claim that both Hunter's book and the motion picture version were plagiarized from "Shadows" and "Hickory Stick" and that plaintiffs' statutory and common-law copyright in those works have thereby been infringed.[4] Plaintiffs seek an injunction, damages, an accounting and costs of the action, including attorneys' fees.[5]

---

1. This and similar jurisdictional findings are as of the time the action was instituted.

2. Apparently defendant Hunter was not served by plaintiffs in the main action. However, both Simon and Schuster and MGM assert cross claims against Hunter in the event judgment is recovered by plaintiffs against them. Defendant MGM also asserts a cross claim against Simon and Schuster. By order of this Court, pursuant to Rule 42(b), Fed.Rules Civ. Proc., 28 U.S.C., the claims of various defendants against each other were deferred until resolution of the issue of lia-

bility, if any, of the defendants, or any of them, to plaintiffs.

3. Plaintiffs' proposed Findings of Fact, par. 9.

4. Plaintiffs claimed originally that defendants also infringed their rights in another play, "A Diller A Dollar." This claim was dropped prior to trial. Tr. p. 3.

5. Defendants, inter alia, seek allowance of attorneys' fees under 17 U.S.C. § 116. By stipulation, consideration of this matter was deferred pending resolution of the main issues.

## I

Before reaching the merits, there is a preliminary question to be considered. Defendants claim that plaintiffs have forfeited any statutory or common-law copyright by making a "general publication" of both "Shadows" and "Hickory Stick." If this contention is correct, that would dispose of the case, since plaintiffs urge no theory in support of their complaint which is not based on copyright law.

With regard to this issue of forfeiture, plaintiff Stephani testified[6] that copies of the plays had been distributed in 1943–1944 to persons who were potential buyers, financial backers or persons connected with the production of "Hickory Stick." However, there was no evidence indicating that distribution had been made except to sell or arouse interest in producing the plays, or in connection with the production of "Hickory Stick." Stephani testified that he made no other distribution of the plays and that "the copies were too valuable to distribute to people just to read."[7] Defendants' argument that plaintiffs forfeited their rights to protection of the works by making a "general" publication of the plays must accordingly fall. Restricted distribution to a circumscribed class of persons of an unpublished work, whether copyrighted under 17 U.S.C. § 12 or uncopyrighted, for the purpose of arousing interest in a possible sale or production, is a sufficiently limited distribution to work no forfeiture of an author's rights.

In Hirshon v. United Artists Corp., 100 U.S.App.D.C. 217, 243 F.2d 640, 644–645 (1957) some 2,000 copies of an unpublished song "were distributed to broadcasting stations and professional musicians for 'plugging' purposes." The Court of Appeals for the District of Columbia refused to hold, on a motion for summary judgment, that there was "such general publication as to vitiate appellant's copyright." The court also pointed out that "From the results of the decided cases, the principle is discernible that it takes more publication to destroy a common-law copyright than to perfect a statutory copyright." See American Visuals Corp. v. Holland, 239 F.2d 740, 743 (2 Cir., 1956). In Ilyin v. Avon Publications, Inc., 144 F.Supp. 368, 373 (S.D.N.Y.1956) 100 copies of an uncopyrighted work were distributed "to certain theatrical producers free of charge in an effort to induce them to produce the work." This Court held that this "was not a publication within the meaning of the act." See also Jerome v. Twentieth Century Fox-Film Corp., 67 F.Supp. 736, 739 (S.D.N.Y.1946) aff'd 165 F.2d 784 (2 Cir., 1948). The public performance of "Hickory Stick" in New York in 1944 was not an abandonment of plaintiffs' copyright protection[8], and, indeed, defendants make no such contention. Continental Casualty Co. v. Beardsley, 151 F.Supp. 28 (S.D.N.Y. 1957) modified and aff'd 253 F.2d 702 (2 Cir.), cert. denied, 358 U.S. 816, 79 S.Ct. 25, 3 L.Ed.2d 58 (1958), on which defendants rely heavily, does not support the conclusion that plaintiffs here forfeited their rights. In that case, Judge Palmieri held, and the Court of Appeals for this Circuit affirmed his holding, that the distribution of 100 copies of an uncopyrighted work constituted a divestitive publication because the distribution had not been limited "as to persons or as to purpose." 253 F.2d at 707. There has been no proof in this case that the distribution plaintiffs made of their works was unlimited as to persons or to purpose. So limited, the distribution effected no forfeiture.[9]

---

6. Plaintiff Stephani did not appear at the trial. The portions of the examination before trial of Stephani read into the record are contained at Tr. pp. 157–159, 161–179.

7. Tr. p. 159 (Plaintiffs' Exhibit 10 for identification, p. 287).

8. Ferris v. Frohman, 233 U.S. 424, 32 S. Ct. 263, 56 L.Ed. 492 (1912).

9. Counsel have cited only federal cases on the point of forfeiture and do not ar-

## II

■ Plaintiffs' primary claim is that defendant Hunter had access to plaintiffs' plays and that he copied from them. There was an oblique attempt made by plaintiffs to show that Hunter actually saw the play "Hickory Stick" when it was performed in May 1944 in New York City.[10] At that time, Hunter, a 17-year old [11] art student, was not interested in becoming a writer. In his testimony, Hunter denied that he saw the play performed. I do not believe that plaintiffs seriously contend that Hunter ever saw the play performed and, in any event, I find that there is no credible evidence to sustain a finding that he did.

The proof urged to show access and copying by Hunter is mainly the allegedly "great number of similarities between the works." It is true that, to substantiate their claims, plaintiffs also point to various other facts, such as that Hunter sought the assistance of sources other than his own experience, that his experience as a teacher in a vocational school was of a limited nature, and that he did not plan to write the book during the period when he was engaged in teaching. Hunter's teaching experience was as follows: during the period from February to June 1950, Hunter taught English as a student teacher at Machine and Metal Trades High School, a vocational high school in the City of New York; during the month of September 1950, he taught English at Bronx Vocational High School, another vocational high school in New York City.

During the months from August 1953 to January 1954, Hunter wrote and created the novel "The Blackboard Jungle." The main character is Richard Dadier, who shares many physical characteristics with Hunter, and much of his personal background as well. In the novel, Dadier is represented as a married Navy veteran of World War II, who lived in the Bronx and attended Hunter College, where he "majored" in English and "minored" in education and performed in amateur plays. Dadier is further described as a student teacher in a trade school who, upon his graduation from Hunter College, secured an "emergency" license to teach and then taught English in a vocational high school. All of this describes Hunter and Dadier with equal accuracy. It is clear that Hunter could have been—as Hunter testified he was [12]—the basis for the character Richard Dadier in the novel "The Blackboard Jungle."

■ Hunter, since 1954, has become a professional writer of established reputation whose works have sold well. Hunter's writing habits, his methods of research and his manner on the witness stand all demonstrate that he retains and uses his experience as grist for the writer's mill. While his teaching experience in a vocational school was limited, it was vivid and clearly sufficient to provide Hunter, a writer with a receptive mind, with many details that could be incorporated into a novel about a teacher in a vocational school. The "other facts" relied upon by plaintiffs, therefore, do not support plaintiffs' contentions of access and copying. In the last analysis, plaintiffs' claim of "great number of similarities between the works" is the crucial question.

## III

Attached to this opinion as an Appendix is a detailed summary of the plots of the four works in question. Plaintiffs' two plays are essentially melodramas, with a vocational school background, focusing on incidents in the lives

---

gue that state law may apply. For the view that state law may be applicable, see Continental Casualty Co. v. Beardsley, supra, 151 F.Supp. at 39, 40.

10. Plaintiff Burnett testified that there were three or four days of previews of the play to which students were invited, including students of Cooper Union (Tr.

p. 23). Hunter was a student at Cooper Union at that time (Tr. p. 284). On cross-examination, Burnett admitted that he had no direct knowledge of the distribution of tickets (Tr. pp. 99–100).

11. Tr. p. 281.

12. Tr. p. 292.

of three students, a teen-age boy, his sister and the boy with whom she is in love. The protagonist of the novel and motion picture is a teacher at a vocational school, and these works are concerned primarily with his problems.

Plaintiffs attempted to substantiate their claim of infringement with detailed charts of 25 "specific similarities" between their plays and Hunter's novel,[13] and extensive "similarity of characters" [14] in all the works. I have carefully read or viewed the works in question and considered all the evidence in this case, including the charts. I have observed the manner in which testimony was given. I have also examined the alleged parallelisms [15] listed in plaintiffs' charts.[16]

▆ Reexamination of the charts only reinforces my conclusion that defendants are entitled to judgment. Hunter did not copy from plaintiffs. Any similarities between plaintiffs' plays and the novel and motion picture involve language that is insignificant or characters or plot ideas that are so general as to be uncopyrightable. It is true that all four works have similarities growing out of the vocational school background. Thus, in each work, there are idealistic teachers, cynical teachers, stupid students, intelligent students and unruly students and relationships between them. Such stock characters and situations are inherent in use of the school as a background and are not copyrightable. The familiar test of copyrightability distinguishes between the "ideas" used by the author and his "expression" of them. Only the latter is said to be copyrightable. Holmes v. Hurst, 174 U.S. 82, 86, 19 S.Ct. 606, 43 L.Ed. 904 (1899). The problem of separating protectible matter from unpro-

tectible matter is often considerable, but resolution of the issue is aided here by the breadth of what plaintiffs claim is theirs. Judge Learned Hand's words in Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2 Cir.) cert. denied, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1930) are apposite:

> " * * * Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended. * * * Nobody has ever been able to fix that boundary, and nobody ever can. * . * *

> " * * * But we do not doubt that two plays may correspond in plot closely enough for infringement. How far that correspondence must go is another matter. Nor need we hold that the same may not be true as to the characters, quite independently of the 'plot' proper, though, as far as we know, such a case has never arisen. If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and fop-

---

13. Plaintiffs' Exhibit 8. Most of the 25 "similarities" listed in Exhibit 8 were also allegedly contained in the motion picture.

14. Plaintiffs' Exhibit 7.

15. See Arnstein v. Porter, 154 F.2d 464, 468 (2 Cir. 1946); Greenbie v. Noble, 151 F.Supp. 45, 70 (S.D.N.Y.1957).

16. Even though there was a jurisdictional objection by Simon and Schuster to consideration of "Hickory Stick" (see p. 335 below), I have considered the complete text of both plays, including any matter unprotected by statute, as evidence on the issue of copying. Morse v. Fields, 127 F.Supp. 63, 66, n. 3 (S.D. N.Y.1954).

pish steward who became amorous of his mistress. These would be no more than Shakespeare's 'ideas' in the play, as little capable of monopoly as Einstein's Doctrine of Relativity, or Darwin's theory of the Origin of Species. It follows that the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly."

In the same case, the Court also pointed out (45 F.2d at 122):

"A comedy based upon conflicts between Irish and Jews, into which the marriage of their children enters, is no more susceptible of copyright than the outline of Romeo and Juliet."

Similarly, plot ideas were regarded as not copyrightable in the following cases: Rosen v. Loew's Inc., 162 F.2d 785, 788 (2 Cir. 1947) (burning of Jewish books and hostility of German students toward Jewish teachers in Nazi Germany); Bein v. Warner Bros. Pictures, Inc., 105 F.2d 969, 970 (2 Cir. 1939) (life in a reform school); MacDonald v. Du Maurier, 75 F.Supp. 655, 660 (S.D.N.Y.1948) (second wife living in a home formerly occupied by her husband and his first wife); Rush v. Oursler, 39 F.2d 468 (S.D.N.Y.1930) (murder in theater during a performance).

It is against this background of applicable law that plaintiffs' claims and charts are best assessed. Plaintiffs point to the following, inter alia, as alleged similarities between the works:

(a) the confusion at a teacher's first meeting with his class;[17]

(b) a teacher forming an alliance with the class leader;[18]

(c) discipline through physical punishment;[19]

(d) a teacher showing the importance of English in everyday life;[20]

(e) a reference to the orchestra leader, Harry James;[21]

(f) a reference to football;[22]

(g) an experienced, cynical, uninterested teacher given to physical punishment;[23]

(h) a sneaky, cunning, belligerent student, bitter at the world;[24]

(i) a school principal who is a pompous, stupid man, uninterested in teaching problems.[25]

■ With respect to language alone, plaintiffs regard as significant evidence of copying, among other things, that a teacher in both plaintiffs' works and in Hunter's novel is referred to as a "cop,"[26] and that students address the teacher not by his right name, but as "teacher" or "teach."[27] A careful comparison of the works leads only to the conclusion that the claimed significant similarities are either non-existent, trivial or noncopyrightable. They are the product of plaintiffs' misguided zeal. Discussion of two items on the charts will help to clarify the point.

1. A claimed similarity[28] involves Dadier (the teacher and protagonist) in one of the most important episodes in the novel and motion picture "The Blackboard Jungle." After months of a total inability to teach his students anything, Dadier is able to excite their imagination by reading an allegory to them and teaching them what an allegory is. He reads a Heywood Broun story, "The Fifty-First Dragon," which deals with a young knight with "no zest for * * *

---

17. Plaintiffs' Exhibit 8, item (6).

18. Id. item (7).

19. Id. item (12).

20. Id. item (13).

21. Id. item (15).

22. Id. item (17).

23. Plaintiffs' Exhibit 7, item (2).

24. Id. item (4).

25. Id. item (6).

26. Plaintiffs' Exhibit 8, item (11).

27. Id. item (5).

28. Plaintiffs' Exhibit 8, item (18).

knightly pursuits" because he lacks self-confidence. The knight is able to overcome his fear of killing dragons only by using a "magic" word which his teachers have given him. After he discovers that he has used a meaningless word as a prop to his courage, he is eaten by a dragon. The students are stimulated by this lesson and, moreover, themselves recognize that they have been unusually stimulated. Their hostility, for the moment at least, has been overcome.

Plaintiffs claim that "similar teaching devices" are used in their plays. They rely on the attempt of Kirkland (the main teacher in plaintiffs' plays but by no means the protagonist) to teach his class about O. Henry, characterized as a "writer who didn't like to write." In plaintiffs' plays, at a few places in two pages of the typewritten manuscript of each, one student tells Kirkland O. Henry's birthplace and another student refers to him as a "smart guy." The class is then disrupted by another student's provocation of Kirkland. It is impossible to find evidence of any intent by the authors to endow the subject matter of the lesson with the significance they now attribute to it. The lesson in plaintiffs' plays has no effect whatsoever on class or teacher. In "The Blackboard Jungle," however, nine pages at an important point in the book are devoted to describing what becomes an exhilarating experience for Dadier. It confirms his feeling that the students can indeed be taught and that he can teach them. Moreover, it is based upon an actual teaching experience known to Hunter of using "The Fifty-First Dragon" in a vocational high school English class.[29] The alleged similarity does not exist.

2. Plaintiffs made much at the trial of the fact that the room in which Kirkland teaches in their plays and the room in which Dadier teaches English in "The Blackboard Jungle" are both numbered 206.[30] I believe that Hunter satisfactorily explained this similarity: in his novel, while Dadier is teaching in Room 206, he is interrupted and almost drowned out by the noise from a machine shop in the room overhead. Hunter testified that Room 206 in the vocational high school at which he himself had taught is also beneath a noisy machine shop.[31] He further testified that that room is near a stairwell and is located at a specific place on the long stem of the "L"-shaped building of the school.[32] Room 206 in his novel is located near a stairwell and at the same place on the long stem of the "L"-shaped school building in his book, and Hunter chose the room out of fidelity to physical accuracy. That this explanation is credible is shown by Hunter's testimony on how he wrote his novel. To a large extent, Hunter incorporated into his book the literal details of actual phenomena. Thus, he testified that his description of the surroundings of Lenox Hill Hospital and the hospital itself—named in the novel as the hospital where Anne Dadier bears her child—is based on his notes and sketches of the hospital and the neighborhood in which it is located.[33] Also, much of the detail of some of Dadier's teaching experiences, such as the material used and the class reaction to it, was based on Hunter's actual experience.[34] Hunter's testimony as to why he chose room number 206 is, therefore, fortified by his showing of his literal reproduction in the novel of actual circumstances and events. Therefore, this alleged similarity justifies no inference of copying.

Regardless of the difficulty often encountered in defining protectible matter in particular cases, it should be apparent from plaintiffs' highly general "descriptions" of "similarities" that plaintiffs are on the wrong side of the vague boundary between "ideas" and "expression." Moreover, careful analysis of the works

29. Tr. p. 288.

30. Plaintiffs' Exhibit 8, item (1).

31. Tr. p. 339.

32. Id. at p. 340.

33. Id. at pp. 349–350.

34. Id. at pp. 286–288, 341–344, 346–347.

shows that no meaningful similarities of plot, characters, dialogue or language, no similar development of themes have been shown by plaintiffs—at least not to this average reader.[35]

From all of the evidence, therefore, it appears that this action is based upon

> " * * * that obsessive conviction, so frequent among authors and composers, that all similarities between their works and any others which appear later must inevitably be ascribed to plagiarism." [36]

I make the following additional findings:

Hunter was the model for the character Richard Dadier in the novel "The Blackboard Jungle" and the character Dadier was not patterned on any character created by plaintiffs. Anita Hunter, Hunter's wife, served as the model for the character Anne Dadier in the novel "The Blackboard Jungle." Various teachers described in "The Blackboard Jungle" are patterned after and based on various teachers known to Hunter who taught at Bronx Vocational High School and at Machine and Metal Trades High School. The school described in the novel "The Blackboard Jungle" as "North Manual Trades High School" is a fictionalized representation of Bronx Vocational High School, and the description of the room 206 and its location in the fictional school in "The Blackboard Jungle" correspond to the actual room numbered 206 and its location in Bronx Vocational High School in the City of New York.

Peter Schwed ("Schwed"), Vice-President and Executive Editor of Simon and Schuster testified at trial. His straightforward testimony, which I believe, was that he was the only officer, employee or representative of Simon and Schuster or Pocket Books, Inc. who suggested to Hunter any revision or change in the manuscript of the novel "The Blackboard Jungle" before it was published.

No copy of "Hickory Stick" or "Shadows" was sent to or received or read by Hunter or by Schwed before the novel "The Blackboard Jungle" was published. At the time the play "Hickory Stick" was performed in New York City, Schwed was outside the territorial limits of the United States serving in the armed forces of the United States.

Schwed did not attend any performance of "Hickory Stick," and neither he nor Hunter had any knowledge of the existence of "Shadows" or "Hickory Stick" before the novel "The Blackboard Jungle" was written or before it was published. Defendants Simon and Schuster and Pocket Books, Inc., Hunter and Schwed did not have access to a copy of "Hickory Stick" or "Shadows." The novel "The Blackboard Jungle" was written solely by Hunter with some editorial assistance from Schwed. No part of "Shadows" or "Hickory Stick" was used by Hunter, or copied or considered in the writing, preparation or creation or revision of the novel "The Blackboard Jungle." No part of "The Blackboard Jungle" was copied from or infringes "Shadows" or "Hickory Stick."

The main characters of the novel "The Blackboard Jungle" are dissimilar from the main characters of the plays "Shadows" and "Hickory Stick." The theme, story and plot development of the novel "The Blackboard Jungle" are dissimilar from the theme, story and plot development of "Shadows" or "Hickory Stick." The only similarities between the novel "The Blackboard Jungle" and the plays "Shadows" and "Hickory Stick" are those that would normally follow from the fact that many of the events in the novel and in the plays took place in a vocational high school in New York City.

## IV

■ Plaintiffs also claim that MGM had independent access to their works

35. See Morris v. Wilson, 189 F.Supp. 565, 570 (S.D.N.Y.1960), aff'd per curiam 295 F.2d 36 (2 Cir. 1961).

36. See Dellar v. Samuel Goldwyn, Inc., 150 F.2d 612, 613 (2 Cir.), cert. denied, 327 U.S. 790, 66 S.Ct. 802, 90 L.Ed. 1016 (1945).

and independently copied them.[37] The claim of access is credible since MGM admits that, in 1943 and 1944, copies of "Shadows" and "Hickory Stick" were submitted by plaintiffs to MGM. However, access alone without copying is insufficient to find infringement. Arc Music Corp. v. Lee, 296 F.2d 186 (2 Cir. 1961). MGM purchased the rights to Hunter's novel shortly after it was published in 1954. Thereafter, a motion picture adaptation was prepared by Richard Brooks ("Brooks"), a screenwriter and director in MGM's employ. Brooks testified at the trial that he closely followed the theme, plot and character development, making such incidental changes as he considered appropriate in adapting the novel.[38] He testified that he did not know of the existence of plaintiffs' plays when he wrote the motion picture adaptation of the novel and directed the film. I believe Brooks.

To prove MGM's independent copying, plaintiffs rely not only on the similarities already referred to but also on four "similarities in play and movie, not in book." [39] These four additional similarities are:

(a) the "climactic device of indecision whether to quit teaching, the decision to quit, persuasion by others not to, and final decision to stay";

(b) the "use of pole as weapon in fight between teacher and student for protection of teacher";

(c) the "suggestion of homo-sexuality under similar treatment both ending on identical theme";

(d) "students dancing at opening of scene."

■ I have carefully examined these alleged similarities and they range from the merely erroneous or noncopyrightable to the ridiculous. Suffice it to say that the comments above (pp. 331, 332–333, 333–334) regarding alleged similarities between plaintiffs' plays and Hunter's novel apply here as well. I find that Brooks and MGM did not copy from plaintiffs' plays and that the motion picture does not contain any copyrightable material copied from plaintiffs' plays. The motion picture is clearly based upon Hunter's book.

V

■ Defendant Simon and Schuster, inter alia, moves to dismiss the complaint as to it so far as "Hickory Stick" is concerned, arguing lack of jurisdiction. It claims that because "Hickory Stick" was never copyrighted, there is no federal question jurisdiction, and diversity jurisdiction is absent because plaintiff Burnett and Simon and Schuster are citizens of the State of New York. Plaintiffs claim that the bulk of "Hickory Stick" is protected by the copyright on "Shadows" so that there is federal jurisdiction even if diversity of citizenship is lacking. There is concededly federal jurisdiction over Simon and Schuster as to the alleged infringement of "Shadows." If plaintiffs' claim were confined to "Shadows" alone, my findings of no copying and no infringement would remain the same. In addition, even if plaintiffs' cause of action relating to "Hickory Stick" were not properly before the Court as against Simon and Schuster, diversity jurisdiction would appear to remain with respect to plaintiffs' claim of infringement of this work as against MGM. In view of these factors and my findings on the merits regarding both plays, I do not believe it necessary or advisable to deal with the complicated subsidiary issue of whether "Hickory Stick" is protected by the copyright on "Shadows" and, if so, to what extent.

Accordingly, based upon all of the evidence in the case, my judgment as to the credibility of witnesses, where appropriate, and my findings of fact al-

---

37. Plaintiffs allege two causes of action against MGM. The first is discussed in this part IV of this opinion. The other is based upon MGM's use of Hunter's book and, in effect, falls with the failure of the cause of action against Hunter and Simon and Schuster.

38. Tr. pp. 208–210, 216–219.

39. Plaintiffs' Exhibit 9.

ready referred to, I conclude that none of the defendants copied from or infringed plaintiffs' plays, and that defendants are entitled to a judgment dismissing the complaint on the merits. The foregoing shall constitute the Court's findings of fact and conclusions of law in accordance with Fed.Rules Civ. Proc. rule 52(a), 28 U.S.C. A decree, in accordance with these findings, may be settled on notice.

## APPENDIX

"Shadows In The City"

"Shadows" is a melodrama based on the violence and insensitivity of slum-reared high school students and deals with the disaster which a deranged student brings upon himself and other students. A teacher, who is unable to prevent the tragedy, is a prominent character, but the protagonists are the students.

In the first scene, the trial begins of Tony Pessolano, a teen-age boy, for the murder of one of his classmates, Steven Ames. After a succession of defiant witnesses, all students, testify, one James Kirkland asks for permission to conduct Tony's defense. Kirkland was the teacher of all of the students who have appeared, and of Ames as well. After declaring that something more than a personal motive was the cause of the murder, Kirkland asks the audience to go back with him to a metropolitan vocational high school. It is there that the remainder of the play's action takes place.

Kirkland, a recently discharged wounded war veteran, begins at the school as an English teacher. He talks with several teachers, among them Lorimer, an earnest young man who speaks in passing of the difficulty of dealing with disciplinary problems in the school, and Walsh, a bantering but cynical man. Walsh advises Kirkland that the school is populated with the most stupid and incorrigible students in the high school system, and that physical punishment is the best means of insuring discipline. Kirkland then meets several of his students-to-be: Tony, a disciplinary problem and the leader of the class; McLemore, a brutish boy who wants Tony's sister, Rita, as his girl; Rita, an attractive seventeen-year old who loves Ames; and Ames, an intelligent boy who is filled with bitterness which he fortifies by reading Housman. In Kirkland's class, these students and their fellows are unresponsive and unruly.

Kirkland recognizes Ames' intelligence. When he attempts after class to discover the reason for Ames' embitterment, he is rebuffed and is told by the boy that his father is a criminal and his mother a madam.

Kirkland's attempt to teach the class is, throughout the play, frustrated by its unresponsiveness and by Tony's trouble-making. This eventually leads to a fight between Tony and a provoked Kirkland. Tony complains to the principal that Kirkland struck him. Kirkland decides to leave of his own accord, in despair at having had to resort to physical force.

The major story in the play is that of Rita's infatuation with the unhappy Ames. Early in the second act, Rita tells Kirkland that she loves Ames and asks for his help, but he refuses. Rita is also concerned about Tony's possession of a gun belonging to their older brother, Joe, who has been sentenced to prison. Afraid that Tony will injure or kill someone with the gun, Rita entreats Ames to help her get it from Tony. Ames is bitter and sarcastic and quotes Housman to Rita. Rebuffed, she begins to cry; Ames attempts to soothe her. They are interrupted by McLemore, with whom Rita exits.

In the final act, Walsh expresses his rage at Tony for complaining to the principal that Kirkland had struck him, and encourages other students to strike Tony under Walsh's approving eye. Walsh is himself about to assault Tony when Lorimer enters to say that Kirkland is leaving but could be induced to remain by an expression from the students that they wanted him to stay. When Kirkland enters, they voice such sentiments, but Kirkland is immediately told by Ames that the students were coerced.

Kirkland is hurt and leaves. Walsh attacks Tony only to be interrupted by the sound of a siren signalling an air raid drill.

When the room empties, Rita and Ames have their last meeting. She protests her love, but Ames is at first immovable. He complains of his father who deserted his mother, leaving her to bear him in a world of misery. Later, however, he softens, and they talk wildly about running away to marry. He indicates that he wishes to die. He pretends to become passionate towards her, though his real motive is to obtain the gun so that he can kill them both. At that point, Tony enters and Ames goads him into shooting him. He dies laughing. Kirkland closes the play saying Tony and thousands like him are "a product of our social system."

"Hickory Stick"

"Hickory Stick" is a rewritten version of "Shadows," with some changes in both dialogue and minor characters. There is no courtroom scene. Kirkland is somewhat more idealistic than he was in "Shadows"; Walsh is the same; Dan Lorimer has become Karen Lorimer, but continues to be a minor character. Again, the major characters are three students—Tony and Rita Pessolano and Ames. Ames is more specifically endowed with a death-wish, and now reads Nietzsche and Schopenhauer, rather than Housman.

A noticeable difference between plaintiffs' two plays is that in "Hickory Stick" Kirkland and Tony become friends. During his war service, Kirkland had become friendly with Tony's older brother, Frank, who was killed in action. After the first class he teaches, in which Tony deliberately creates a disturbance, Kirkland tells Tony that he knew Frank. Tony, producing a letter from Frank, recalls that in it Frank had mentioned Kirkland with warmth. He becomes remorseful and he and Kirkland agree to be friends.

Ames, however, inspires the belief among the students that Tony is currying favor with Kirkland, whom they call a "sissy." Tony, to prove that this is not true, agrees to provoke Kirkland into striking him. After a fight occurs, Ames writes a letter to the principal over Tony's signature, complaining that Kirkland struck him. Also after the fight, Joe Pessolano, Tony's brother and a fleeing criminal, appears and asks Tony to keep his gun. Tony agrees. Later when Tony learns that Ames wrote the letter, he is forced to remain mute out of fear that Ames will expose his possession of the gun.

The other events in "Hickory Stick" substantially parallel those in "Shadows" except that, at the end of the play, after Ames has taunted Tony into shooting him, Kirkland returns. He states that Ames wished to die and announces that he will stand by Tony and all those young men in the vocational school who can turn out "all right" despite the indifference of so many of their teachers.

"The Blackboard Jungle" (the novel)

The protagonist in "The Blackboard Jungle" is Richard Dadier, a young man who was graduated from college after his discharge from the Navy. The major theme of the book is his struggle, as a beginning teacher of English in a vocational high school, to communicate with his students and to avoid becoming a resigned or embittered failure. The novel traces Dadier through a detailed series of frustrations with his students, a transitory classroom success, and, at the end of the book, to a limited victory over the defiance and resentment of his students, and the feeling that he can be useful in his job by "reaching" a few students. A related theme is the effect of the job and the hazards incident to it on his relationship with his wife, Anne, with whom he is deeply in love.

Each of two other beginning teachers is the focus of a subplot of considerable scope. Lois Hammond is a highly attractive young woman who makes repeated attempts to seduce Dadier, which he rebuffs. Joshua Edwards is weak but idealistic; his idealism persists even after he and Dadier are badly beaten by some students one evening. However,

when Edwards attempts to communicate to the students his enthusiasm for jazz by bringing to school his prized record collection, they smash it and soon after this event he leaves the school.

Dadier's students are, at the outset and throughout most of the book, unresponsive if not defiant. Among them are Gregory Miller, a Negro, the leader of the class and obviously equipped with greater intelligence than his fellows; Arthur West, a vicious thug; and Santini, a mentally retarded boy. During Dadier's first meeting with his class, he is threatened, West is openly insulting, and Miller defies him with constant remarks. After his first class, Dadier hypocritically attempts to enlist Miller on his side by flattering him in order to get Miller to cooperate with him and thereby set an example to his classmates.

As the plot unfolds, Dadier prevents Lois Hammond from being raped by a student, whom he forcibly subdues. The students, when they learn that the would-be rapist is to be prosecuted, resent and mistrust Dadier. His own class is deliberately obtuse as a gesture of rebellion. Dadier is told of the class' attitude by Miller, who now much resents Dadier's attempt to use him to keep order in the classroom.

Dadier's problem with his students multiply after he and Edwards are beaten by them in a vivid episode: in a class, he attempts to provoke them to write imaginative compositions by acting out the topic he assigns, but is deeply disappointed to find that they merely attempt literal descriptions of his actions in nearly illiterate prose; his attempt to arouse their interest in diction totally fails when Miller encourages one student to speak with his usual obscene vocabulary; Arthur West, who remains vicious, threatening and incorrigible throughout the novel, falsely reports to Mr. Small, the pompous school principal, that Dadier is a bigot, and Dadier must furiously explain that the report is a perversion of the true context of his words.

Dadier fights despair at his failure to communicate with his students. He refuses, however, to surrender to the cynicism of Solly Klein, a veteran teacher with whom he occasionally debates whether and what the students can be taught. Klein constantly tells him that the students cannot and will not learn and that the function of the teacher in a vocational high school is to occupy the students and keep them off the streets, while protecting himself physically as best as he can. Most of the other teachers with whom Dadier discusses his difficulties agree with Klein. Some, such as Captain Schaefer, a minor character who is the physical education teacher, go further and state bluntly that physical force is the only solution.

Dadier finally begins to have rare instances of success: he is deputized to direct the school's Christmas play, and Miller and a group of other boys volunteer to sing. They are cooperative and Dadier and Miller are able to speak frankly to each other at rehearsals, although Miller remains unruly in class. Also, Dadier finally feels that he has "reached" his class when he reads them a story which they excitedly realize is an allegory from which they can learn a message.

However, Dadier is unable to see his successful Christmas play and is unable to capitalize on his success at communicating to the class. His wife Anne has a miscarriage, partially brought on by worry over a series of anonymous letters sent by Arthur West which tell her that Dadier and Lois Hammond are having an affair. This is not true. Dadier is forced to miss a week of school. Upon his return after the Christmas holidays are over, he finds that he must begin again to try to "reach" his students and he is almost totally discouraged. Yet, at the climactic moment of the book, when he is attacked in the classroom and knifed by West, the students, led by Miller, intervene to protect him. The students also understand—again led by Miller—that Dadier must report the incident. The book ends after this inci-

dent, with Dadier convinced that his role as a teacher is to try to stimulate his students with the hope of inculcating in just a few of them a genuine desire to learn.

"The Blackboard Jungle" (the motion picture)

The motion picture version of Hunter's novel is quite faithful to the novel, although it picks out the more dramatic scenes in the book and eliminates others. Some of the most noticeable differences are the following: a detective investigating the beating of Dadier and Edwards attempts to induce Dadier to press charges against the attackers; Dadier revisits a former teacher of his and tours an academic high school at which he could teach if he left his job at the vocational school; a group of students, led by West, assault the driver of a newspaper truck and steal the truck; Anne Dadier's child lives; during the period when there is some doubt about whether the child will survive, Dadier decides to quit, and Jim Murdock, who is patterned after Solly Klein in the book, attempts to persuade him not to. Anne Dadier finally persuades her husband to remain at the school.